## MINNESOTA MINING & MFG. CO. v. PAX PLASTICS CORPORATION et al.
### Civil Action No. 45C846.

District Court, N. D. Illinois, E. D.
March 30, 1946.

304

Haight, Goldstein & Hobbs, of Chicago, Ill., and Carpenter, Abbott, Coulter & Kinney, of St. Paul, Minn., for plaintiff.

The Firm of Charles W. Hills and Davis, Lindsey, Smith & Shonts, all of Chicago, Ill., for defendants.

BARNES, District Judge.

This suit came on for hearing on two complaints of Minnesota Mining & Manufacturing Company, a corporation of Delaware having its principal place of business at St. Paul, Minnesota, hereinafter sometimes called "Minnesota," charging infringement of the Drew patent 2,177,627 for adhesive sheeting granted to it on October 31, 1939. The application was filed by Richard Gurley Drew on February 18, 1938, as a division of a co-pending application filed June 10, 1933, and was in part a continuation of a co-pending application filed May 1, 1931. Both complaints were filed in May, 1945, and the two suits thereby commenced were later consolidated by order of court and ordered to proceed under the above title and number. Minnesota seeks an injunction and an accounting against each of the defendants.

The defendants named in one complaint are the Pax Tape Sales Company of Illinois (formerly Pax Plastics Corporation), a corporation of Illinois, hereinafter sometimes called "Pax"; Harve Ferrill & Co., a partnership, and the individual co-partners, hereinafter sometimes collectively called "Ferrill"; and Bulkley Dunton & Co., a partnership, and the individual co-partners, hereinafter sometimes collectively called "Bulkley." The Cofax Corporation (formerly named Pax Plastics, Inc.), a corporation of New York, which manufactured the adhesive sheeting in controversy, was named as a defendant, but Minnesota did not succeed in effecting service upon it. It will hereinafter sometimes be called "Cofax." The defendant named in the other complaint is Freydberg Bros.-Strauss, Inc., a corporation of New York, hereinafter sometimes called "Freydberg".

During the trial the claims in suit were restricted by Minnesota to claims 1, 2 and 3 (on what for convenience will be called the colored type of tape) and claims 4, 5, 6, 7, 8 and 15 (on what for convenience will be called the transparent type of tape). None of these claims recites the presence of a "primer" as do certain other claims of the patent. The defendants have contended that the accused tapes are "two-element" tapes consisting solely of a backing film and a pressure-sensitive adhesive coating, without any "primer" or its equivalent, and Minnesota conceded during the trial that it had not been able to secure evidence to present to the contrary.

The patent in suit was held by this court to be valid and infringed as to claims 4, 5, 6, 8, 10, 11, 15 and 16, in Minnesota's prior suit against International Plastic Corporation et al., Civil Action No. 44 C 202; decree entered June 25, 1945; now pending on appeal. The court's findings of fact and conclusions of law (dated May 28, 1945) have been published (Minnesota Min. & Mfg. Co. v. International Plastic Corp., D. C., 62 F.Supp. 34). For convenience that case will sometimes hereafter be called the "I. P. case." The I. P. case did not involve any of the claims of the patent on the colored type of tape; but it did involve certain claims on the transparent type of tape which are in suit in the present case, namely, claims 4, 5, 6, 8 and 15. The so-called "primer" claims (10, 11 and 16) in issue in the I. P. case are not involved in the present suit.

The trial was greatly shortened by the offering as joint exhibits of the plaintiff and defendants the transcript and relevant exhibits of the I. P. case, with the stipulation that the pertinent testimony of witnesses therein should be received as though actually given in the present trial. The I. P. trial lasted for four weeks and about half of it was devoted to the defense that Guth and not Drew was the inventor. This defense was withdrawn prior to trial in the present case by bill of particulars.

The defense that the Commissioner of Patents exceeded his legal authority in granting the Letters Patent in suit and that the same are therefore void and of no legal effect, and the defense that Minnesota has misused the Letters Patent in suit contrary to the public policy by using the said patent to control and prevent the sale of unpatented materials, were withdrawn by the defendants at the trial and the paragraphs of the answers specifying these defenses were ordered by the Court to be stricken. The defense of delay in the prosecution of Minnesota's claim against the defendants and of acquiescence in the defend-

ants' acts, giving rise to laches and estoppel, was withdrawn prior to trial by bill of particulars.

The defendants deny infringement and allege invalidity of the claims in suit on the prior art; and they assert that the specification and claims are inadequate.

The following patents and publications were pleaded by the defendants:

*U. S. Patents:*

Thornton & Rothwell, 786,534
Kaber, 1,027,547
Knowles, 1,143,407
Brandenberger, 1,221,825
Segall, 1,259,787
Swift, 1,302,100
Hodgson, 1,467,108
Dewey, 1,506,415
Respess, 1,533,272
Brandenberger, 1,548,864
Hutchison, 1,614,924
Farrell, 1,683,453
Teague, 1,719,948
Charch & Prindle, 1,737,187
Brenne, 1,745,977
Teague, 1,746,875
Healy, 1,752,557
Drew, 1,760,820
Doty, 1,779,588
Drew, 1;814,132
Schnitzler, 1,837,680
Mantell, 1,850,760
Drew, 1,856,986
Zimmerli & Havenhill, 1,892,123
Humphner, 1,922,767
Osmun, 1,933,026
MacIver, 1,938,078
Kronstein, 1,944,562
Charch, Hyden & Finzel, 1,953,104
Ziegler, 1,953,901
Kallander, 1,956,579
Dow, 1,962,340

*Foreign Patents:*

British (Liesegang), 253,940
British (Kronstein), 293,293
British (I.G.F.), 302,588
British (Rado), 344,469
French (Rado), 697,145
Belgian (Gombault), 392,738
German (Grossmann), 372,925
Japanese (Nagao), 61,551

*U. S. Publications:*

Pearson's book on Crude Rubber, published in 1918.

Schatz's book on Commercial Art, copyrighted in 1922.

Instruction Sheet for Hutchison Artists Shading Medium (Bourges Service, Inc.).

Best-Test Paper Cement circular, copyrighted, May, 1930.

The following pleaded patents were withdrawn during the trial: U. S. patents 786,534 — 1,027,547 — 1,221,825 — 1,614,-924. Belgian 392,738 and Japanese 61,551. An unpleaded publication was offered in evidence during the trial to show further the state of the art, namely, the Scientific American Encyclopedia of Formulas (1923), pages 284, 285.

Findings of Fact.

1. The jurisdiction of this Court is based on the fact that this is a suit in equity arising under the patent laws of the United States. No objection to the venue of the court, or to service of process, was made by any of the defendants except Cofax. Cofax's motion to quash service was granted prior to the trial.

2. Minnesota is the sole and exclusive owner of the entire right, title and interest in and to the Drew patent in suit, 2,-177,627, granted to it on October 31, 1939.

3. The claims in suit are 1, 2 and 3 (on the colored type of tape) and 4, 5, 6, 7, 8 and 15 (on the transparent type of tape). These claims cover subject matter adequately described in the co-pending application of Drew, Ser. No. 534,386, filed May 1, 1931, and the patent in suit has an effective filing date of May 1, 1931, with respect thereto, both as to primed and nonprimed tapes. This subject matter was also described in the co-pending application Ser. No. 675,291, filed June 10, 1933, of which the application for the patent in suit was filed as a division on February 18, 1938. Patents on said prior applications did not issue until subsequent to the granting of the patent in suit. The obtaining of a patent on the products of the claims in suit was not unduly delayed.

4. The patent in suit gives a sufficiently full, clear, definite and exact written description of the products of each of the claims in suit, and of the manner of making them, to enable those skilled in the art to make and use the same. The patent particularly points out and distinctly claims the products of the claims in suit. Each of the claims in suit is sufficiently clear, definite and descriptive of the structure of the product claimed to apprise those skilled in the art and the public generally of the meaning and scope thereof.

5. The claims in suit do not require the presence of a primer or its equivalent;

and they each embrace non-primed "two-element" adhesive sheeting consisting solely of a backing film and a pressure-sensitive adhesive coating. The specification clearly describes such "two-element" adhesive sheeting, and gives directions which are adequate to enable a person skilled in the art, who follows the directions, to make "two-element" adhesive tape in which the adhesive coating is firmly united to the backing and which can be unwound from rolls thereof, and can be removed from smooth non-fibrous surfaces to which temporarily applied, without delamination or offsetting of adhesive. A disclosure of "two-element" tape appeared likewise in Drew's original application, Ser. No. 534,386, filed in 1931. Such "two-element" tape has been commercially sold by Minnesota. Most of the tape made and sold by Minnesota under the patent in suit has employed a primer, as described in the patent, to obtain an added factor of safety at a trivial increase in cost, and a primer is not necessary for a commercially satisfactory tape. The public has purchased Minnesota's tape because of the uses to which it can be put. Commercial success of the tape was not dependent upon the primer.

6. The claims in suit are drawn to a new kind of adhesive sheet or tape having a field of utility not possessed by any prior adhesive tape of any kind. Whether transparent or colored, and whether involving a primer or not, this tape is stably and aggressively tacky and seals instantly on contact with almost any surface, without moistening or heating. The backing is a thin transparent film having smooth, glassy surfaces, such as cellophane. Both the colored and transparent types have been widely used for sealing packages. The colored type provides an attractive decorative seal for packages and has also been widely used as a coding tape for wires and tubes. The adhesive contains coloring material visible through the transparent film backing and produces the optical illusion that the backing film is colored, thus causing the back surface of the tape to have a lustrous colored appearance. The backing film protects the colored stratum from becoming smeared or dirty in use of the tape, and provides a back surface to which dirt does not readily cling. The transparent type of tape provides an "invisible" sealing, mending and holding tape widely used for sealing

packages, mending books, records, maps and charts, and fastening posters on windows and bulletin boards. Both types of tape have many other uses.

7. Minnesota's "Scotch" Cellulose Tape, made according to directions appearing in the patent in suit, met with immediate public acclaim and has enjoyed an extensive commercial success due to its inherent merit. It has become well known to the public at large because of the many uses to which it is put in homes, offices, schools, stores and factories. The transparent type of tape was first sold near the end of 1930. In 1931 the sales were $103,724.32 and had increased to $5,675,708.42 in 1941. The sales on the colored type of tape were $19,426.83 in 1931 and had increased to $802,811.97 in 1941. During this period the total advertising expense was only 2.9% of the total sales.

8. Johnson & Johnson, one of the outstanding concerns in the adhesive tape field, soon learned of Minnesota's tape and tried for years to duplicate it, but without success. After the patent in suit issued, Johnson & Johnson and its subsidiary, Industrial Tape Corp., acquired licenses from Minnesota (at a 5% royalty rate), and the latter has paid royalties on both the transparent and colored types of tape covered by the claims in suit, amounting to about $200,000 for the years 1940-1943, inclusive.

9. The Drew tape, to which the claims in suit relate, provided, among other uses, an effective means for fastening or sealing package wrappings of moistureproofed cellophane, to which ordinary adhesives did not properly adhere. Prior to its advent in 1930, the du Pont Company manufactured both the normal and the moistureproofed types of cellophane. du Pont was trying to find uses for both types of cellophane, and was trying to find ways of sealing wrappers of moistureproofed cellophane. It was thoroughly familiar with these materials. It studied adhesives and solicited the aid of adhesive manufacturers. Yet it could do no better in its sales demonstrations prior to Drew's invention than to use rubber bands as a fastening means for packages wrapped in moistureproofed cellophane. du Pont never conceived of Drew's tape despite the strong incentives. Even today Drew's tape is used on a large scale for sealing and decorating packages wrapped in cellophane, and both the transparent and colored types

are used for this purpose. The advent of Drew's cellophane backed self-sealing tape accomplished two things in which the du Pont Company was especially interested: (1) It provided a new market for normal (non-moistureproofed) cellophane, which is the backing commonly used in Minnesota "Scotch" Cellulose Tape; and (2) it gave the user of moistureproofed cellophane wrappers an attractive means of sealing which was very simple and effective in application.

10. Both the transparent and colored types of Drew's tape would have had a ready market a great many years before they appeared. This is shown by the many uses they have in homes, offices, schools, stores and factories. Cellophane, rubber and resins, used in the manufacture of the tape according to the directions of the patent, were in widespread commercial use in this country at least as early as 1913. The normal (non-moistureproofed) kind of cellophane is used by Minnesota. Such cellophane was in widespread use by 1913 for wrapping candy boxes and was obviously cheap enough for making tape to seal such wrappings. Rubber-resin adhesives had been used in the shoe trade for a great many years, going back to at least 1905. Non-fibrous films date back to the last century in the photographic art. It was not the want of materials, nor the costliness of the materials, nor the want of a ready market, which delayed the appearance of Drew's tape in suit.

11. In the prior art there was the idea that tacky adhesives, employed in making self-adhering adhesive tapes, must be coated on fibrous backings such as cloth and paper, as illustrated by the prior surgical, electrical, bicycle and masking tapes. This provided an interlocking with the fibers and a greater area of contact, serving to increase the anchorage of the adhesive to the backing in mechanical fashion.

12. Drew discovered that an adhesive properly compounded of a rubber base and a tack-producing resin base could be coated upon a cellophane film (whether primed or unprimed) and would be firmly united thereto so that there was produced an aggressively tacky adhesive tape that nevertheless could be unwound from rolls thereof and removed from surfaces to which temporarily applied without delamination of offsetting of adhesive. This effect could not have been deduced from the action of the old tapes having fibrous cloth or paper backings, since in them the adhesive was not coated upon a glassy surface but upon a fibrous surface providing a mechanical interlocking and increased surface area.

13. The prior art was familiar with cellulosic films coated with glue-type adhesives which require moistening, like postage stamp adhesives, because they are normally not tacky (as illustrated by the British Specification 253,940 of Liesegang on court plasters). Also the record shows the old Dennison gummed mending tape having a glassine paper backing coated with a glue. The prior art was also familiar with cellophane sheets coated with rubber solutions, providing so-called adhesive sheetings which, however, were not normally tacky and pressure-sensitive. Upon drying of the volatile solvent they were incapable of use as self-sealing tapes for sealing packages, general mending purposes, fastening posters on windows and blackboards, etc., and were used for other unrelated purposes. This is illustrated by the Mantell patent (1,850,760) on artists' shading films, and the Kronstein patent (1,944,562) on electrical insulating tapes. Such prior art pointed away from and not towards Drew's discovery.

14. The Drew masking tape patent 1,760,820 does not anticipate the products of the claims in suit. It is concerned with masking tape having a unified fibrous paper backing. It mentions Kraft papers and parchmentized papers. It does not mention cellophane nor suggest the use of any other film. The history of Drew's discovery of the tape involved in the patent in suit, as developed in the I. P. trial, shows that Drew himself, was still so influenced by the dogma of the art that cellophane tape did not occur to him until about a year after his application for the masking tape patent was filed on May 28, 1928. The masking tape adhesives of "Examples A and B," when coated on cellophane in a commercially desirable thickness, yield a cloudy appearing tape. It does not have the transparency which the public expects in a transparent tape, nor the colored appearance which the public expects in decorative tape.

15. The claims in suit define invention over Drew's earlier masking tape patent 1,760,820.

16. The Mantell patent 1,850,760 does not anticipate the products of the claims

in suit. It relates to an artist's shading film, to be used in a manner similar to frisket paper and applied to drawings, photographs and the like, with "rubber frisket cement". Rubber frisket cement has been well known to commercial artists for at least thirty years. It consists of rubber dissolved in benzol or other suitable volatile solvent, with no admixed rosin or other tackifier resin. The patent in suit clearly differentiates straight rubber coatings from the rubber-resin adhesives described therein, and specifies the need of the resin base to produce the desired combination of tacky and non-offsetting properties. The addition of tackifying resin to Mantell's rubber frisket cement would render it unsuitable for Mantell's purpose. The Mantell patent neither taught nor suggested the products of the claims in suit. The alleged public use and sale of the Mantell structure was not proved, and in any event adds nothing to the patent.

17. The claims in suit define invention over the Mantell patent 1,850,760.

18. The Kronstein U. S. patent 1,944,562 and the equivalent British patent 293,293, do not anticipate the products of the claims in suit. They relate to an electrical insulating band or ribbon which is asserted to improve upon the prior art by using a backing of non-fibrous cellulose film (cellophane) in place of cloth or paper, and which (as in the prior art) is coated with insulating material such as rubber, linoxyn, nitro-cellulose varnish, etc. The cellophane may be coated on one or both sides, and one coating may serve as a so-called adhesive. There is nothing to suggest that the phrase "any desired degree of adhesiveness" (page 2, col. 2, lines 34–39) implies a normally tacky and pressure-sensitive adhesive condition. The term "adhesive" is very broad and applies to normally non-tacky adhesives (such as those of postage stamps). The coatings of these patents may retain some wet adhesiveness temporarily, but in a short time dry out to a non-tacky condition. When Kronstein uses rubber solution, he obtains a frisket cement type of coating like Mantell.

19. The claims in suit define invention over the Kronstein U. S. patent 1,944,562 and British patent 293,293.

20. The British Specification 253,940 of Liesegang does not anticipate the products of the claims in suit. It relates to "plasters of the court plaster type," the alleged novelty residing in the use of a collodion film backing. The "plaster mass" is the conventional glue composition (such as isinglass) used in making court plasters. Court plasters require moistening.

21. The claims in suit define invention over the British Specification 253,940.

22. The prior art revealed in the record of this case, individually and collectively fails to disclose or suggest the combinations of elements employed by Drew in the products of the claims in suit, both as to primed and non-primed ("two-element") structures. It affirmatively indicates that Drew left the beaten paths and produced a distinctively new type of adhesive tape. Drew went in opposition to known concepts and displayed uncommon ingenuity, beyond that of the normal thinking and research to be expected of persons skilled in the adhesive tape and related arts. The products of the claims in suit resulted from invention of a high order by Drew.

23. Each of the claims in suit, namely, claims 1, 2, 3, 4, 5, 6, 7, 8 and 15, defines novelty and invention over all of the prior art of record in this case.

24. The patent in suit was not obtained from the Patent Office through misrepresentation.

25. The accused tapes of the defendants, the selling and offering for sale and threats of sale of which are relied upon by Minnesota in support of its prayers for injunctive relief and for an accounting, were made by Cofax. Cofax had actual knowledge of the patent in suit, and the patent was studied by its technical staff, prior to starting operations. Freydberg bought from Cofax large mill rolls of the adhesive-coated film and then, at its own plant, slit and wound this sheeting into tape rolls sold by it under the name "Cello" Tape, thus participating in the manufacture of the latter. Bulkley loaned Cofax a large sum of money to enable it to start operations, and sold tape made by Cofax under its own name of "Bulkton" Dri-Seal Tape. Ferrill acted as a sales agent for Bulkley. Pax sold tape made by Cofax under the latter's trade-mark "Pax", which word was a part of its own corporate name. Mr. Harve Ferrill was a partner of the Ferrill firm and was president of Pax.

26. The accused tapes have non-fibrous transparent cellulosic film backings (including cellophane) coated with normally tacky and pressure-sensitive water-insolu-

ble adhesives compounded of a rubber base and a tack-producing resin base. The adhesives are transparent in the transparent tapes; and in the colored tapes the adhesives contain a coloring material visible through the transparent backing which give the illusion that the backing is colored and cause the back surface to have a lustrous colored appearance. The adhesives are non-offsetting and firmly united to the backings. The tapes can be unwound from rolls thereof without delamination or offsetting of adhesive.

27. The accused tapes do not escape from the scope of the claims in suit by the employment in the adhesives of synthetic rubbers in place of natural rubber. Synthetic rubbers were known prior to 1931 but were not in general commercial use because of high prices. The rubbers used by Cofax in making the products were what the government termed synthetic rubber substitutes for natural rubber in the war program to conserve natural rubber. Synthetic rubber was used by the adhesive tape industry in general, including both Minnesota and Cofax, as an effective substitute for natural rubber during the war. Tape adhesive compounded of synthetic rubber and tack-producing resin is a "rubbery base" adhesive and is a "rubber-resin type adhesive" as these terms are employed in claims 2, 5, 6, 7 and 8. The claims in suit are not restricted to adhesives containing natural rubber.

28. The claims in suit do not require the presence of a "primer" and they embrace "Two-element" tapes which do not have a primer element or the equivalent.

29. Whatever may be the effect of Cofax's so-called secret process for making the tapes, the self-proving characteristics of the samples offered in evidence, and the undisputed facts established by the admissions of defendants and by the testimony of record (including the depositions of the president and two technical employees of Cofax), show that Cofax's process does not take the accused tapes outside of the claims in suit.

30. The accused tapes, both transparent and colored, were imitations of Minnesota's tapes, sold and used for the same purposes, in direct competition. The ordinary user could not tell them apart if they were not labelled.

31. The accused colored tapes come within the scope of claims 1, 2 and 3.

32. The accused transparent tapes come within the scope of claims 4, 5, 6, 7, 8 and 15.

33. The defendants Pax, Ferrill, Bulkley and Freydberg, each infringed claims 4, 5, 6, 7, 8 and 15 by selling transparent pressure-sensitive adhesive tape coming within said claims prior to the filing of the complaints herein and within six years prior thereto, exclusive of any sales coming within the provisions of Sections 68 and 94, 35 U.S.C.A.; and said defendants have continued to threaten future infringement unless enjoined.

34. Freydberg has further infringed claims 4, 5, 6, 7, 8 and 15 by participating in the manufacture of the rolls of transparent pressure-sensitive adhesive tape sold by it, namely, by converting large mill rolls of adhesive sheeting obtained from Cofax into small tape rolls by slitting and rewinding at its own plant; and Freydberg threatens to continue doing so unless enjoined.

35. The defendants Pax, Ferrill, Bulkley and Freydberg, each threatened to infringe claims 1, 2 and 3 by their plans and acts, severally and in collaboration with each other or with Cofax, both shortly prior to the filing of the complaints herein and subsequently thereto, and each threatens to sell colored pressure-sensitive adhesive tape coming within said claims unless enjoined. In pursuance of the threats, Pax actually sold colored pressure-sensitive adhesive tape coming within said claims shortly after the filing of the complaints herein and by so doing committed an actual infringement not coming within Sections 68 and 94, 35 U.S.C.A.

36. The cooperative efforts of the aforesaid defendants with Cofax in furtherance of plans and schemes for marketing adhesive sheeting made by Cofax, justifies an injunction against each of them in respect to each of the claims in suit (1–8 and 15) in order to prevent future infringement thereof.

### Conclusions of Law.

A. This court has jurisdiction of the parties hereto (except as to Cofax) and of the subject matter of this cause.

B. Claims 1, 2, 3, 4, 5, 6, 7, 8 and 15 of the Drew patent 2,177,627, all of the claims in suit, are valid.

C. Minnesota has not been guilty of inequitable conduct and has not come into

310

court with unclean hands, and is not barred from securing equitable relief.

D. Each of the defendants Pax, Ferrill, Bulkley and Freydberg has infringed each of claims 4, 5, 6, 7, 8 and 15 by actual sale of transparent pressure-sensitive adhesive tape; and Freydberg has additionally infringed each of said claims by its participation in the manufacture of rolls of such tape sold by it.

E. Pax has infringed claims 1, 2 and 3 by actual sale of colored pressure-sensitive adhesive tape.

F. Minnesota is entitled to a permanent injunction against future infringement of each of the claims in suit of the Drew patent by each of the defendants Pax, Ferrill, Bulkley and Freydberg; and to an accounting of profits and damages, and to costs.

G. Minnesota's complaint must be dismissed as to Cofax in view of the granting prior to the trial of its motion to quash service.