**TECHNICAL TAPE CORPORATION,**
Plaintiff,

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, Defendant.**

United States District Court
S. D. New York.
July 18, 1956.

Daniel L. Morris, New York City, John W. Thompson, Emanuel E. Sternfield, New York City, Robert D. Spille, Brooklyn, N. Y., Curtis, Morris & Safford, New York City, of counsel, for plaintiff.

Harold J. Kinney, Robert I. Coulter, St. Paul, Minn., M. K. Hobbs, Platteville, Wis., H. H. Hamilton, New York City, Edward A. Haight, John W. Hofeldt, Chicago, Ill., for defendant.

BICKS, District Judge.

Technical Tape Corporation, hereinafter referred to as "Tech Tape", seeks a judgment declaring that United States Patent 2,177,627 is invalid and not infringed by the product it manufactures and markets under the trade name "Tuck". Minnesota Mining & Manufacturing Company, the defendant, which will be referred to as "3 M", has counterclaimed for an injunction against further infringement and damages.

The patent has been subjected to judicial scrutiny by the Courts in the Seventh Circuit and consistently upheld. Minnesota Min. & Mfg. Co. v. International Plastic Corp., D.C.N.D.Ill.1945, 62 F.Supp. 34, affirmed 7 Cir., 1947, 159 F.2d 554; Minnesota Min. & Mfg. Co. v. Pax Plastics Corp., D.C.N.D.Ill.1946, 65 F.Supp. 303, affirmed 7 Cir., 1947, 159 F.2d 554; Minnesota Min. & Mfg. Co. v. Neisner Bros., Inc., D.C.N.D.Ill.1951, 101 F.Supp. 926, and D.C.N.D.Ill.1954, 122 F.Supp. 752. Plaintiff's procedural agility [see Minnesota Min. & Mfg. Co. v. Technical Tape Corp., D.C.N.D.Ill. 1954, 123 F.Supp. 497; Technical Tape Corp. v. Minnesota Min. & Mfg. Co., 2 Cir., 1952, 200 F.2d 876] has been rewarded with an opportunity to litigate its claims before a tribunal unfettered by its own prior determinations.

The patent was issued on October 31, 1939 to 3 M as assignee of Richard Gurley Drew, one of its employees, and will be referred to as the "Drew Patent". The application was filed February 18, 1938 as a division of a co-pending application filed June 10, 1933 and was in part a continuation of a co-pending ap-

plication filed May 1, 1931. The invention relates to "adhesive sheets having a backing with a non-fibrous surface (such as normal or waterproofed films of regenerated cellulose) and a coating of normally tacky and pressure-sensitive adhesive united thereto. While not limited thereto, the invention relates especially to transparent adhesive sheets, to adhesive sheets in the form of adhesive tapes which may be sold in stacked or coiled form, and to adhesive sheets or tapes which are well adapted to the sealing or securing of wrappers composed of non-fibrous lustrous cellulosic films and the like". The specification recites that "[A]n object of the invention is to provide a unified adhesive coating possessed of such coherence in relation to adhesiveness and so firmly united to its backing that the adhesive sheet may be stripped from smooth non-fibrous surfaces (not possessing special chemical affinity for the adhesive), to which it may have been temporarily applied, without offsetting of adhesive material. Hence the adhesive coating may be termed 'non-offsetting', and this expression designates an important physical or physico-chemical property or characteristic of the adhesive coating, namely, that its coherency is greater than its adhesiveness." [1] 3 M markets the invented article under the well-known mark "Scotch Brand Cellophane Tape".

Succinctly, the issues in this case are: (1) Is the Drew Patent valid; (2) If valid, has it been infringed by Tech Tape; and (3) Assuming validity and infringement, has the conduct of 3 M been such as to disentitle it to relief against Tech Tape.

Plaintiff founds its claim of invalidity principally on the grounds that: (i) the alleged invention is not a patentable advance over the art because it required no special skill nor any "inventiveness".

(ii) the product claimed in the patent was patented and described by others in printed publications in this and foreign countries before the claimed invention thereof by Drew.

(iii) the alleged invention of the patent was (a) patented or described in a printed publication in a foreign country and (b) in public use more than two years prior to its filing date;

(iv) what the patent discloses as invention was developed by others;

(v) claim 9 of the patent defines an inoperative and useless product and was deliberately included, wherefore acceptance of the patent with such claim was not without deceptive intention;

(vi) what the patent discloses as invention is the same as is covered by the Drew Masking Tape Patent 1,760,820; and

(vii) the specification of the patent lacks the full, clear and concise description required by 35 U.S.C.A. § 112. These contentions will be treated seriatim.

The first ground of alleged invalidity is the not uncommon one urged against an article which is a plurality of well-known elements. It is a mere "aggregation", plaintiff argues, of cellophane and adhesive—neither of which Drew claims to have invented—in which the two elements retain their original characteristics and perform exactly the same functions they possessed and performed before being brought together in the assembly. 3 M, on the other hand, contends that the amalgamation produces a new article, not then previously in existence, possessing qualities and utility different than the components standing alone. Novelty for the adhesive or of any ingredient thereof per se or of the film backing per se is not claimed, but rather in the combination whereby a new article is produced. To discuss this issue in terms of "aggregation" or "combination" can lead to nothing but confusion. See, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed.

[1]. A detailed description of the discovery disclosed in the patent and the inventor's claims are set out at length in the opinions first cited in the text; a repetition thereof would unduly and unnecessarily prolong this opinion.

162. The efforts of the industry to find an article of the utility possessed by the one described in the Drew Patent, the general need and extensive market for such article and the availability of materials to produce it furnish a more helpful guide.

As Judge Learned Hand observed in Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 1946, 155 F.2d 937, 939: "In appraising an inventor's contribution to the art, * * * the most reliable test is to look at the situation before and after it appears. * * * Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. * * * [T]his approach is more reliable than a priori conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions." [2]

DuPont commenced marketing normal cellophane in 1924 and moisture-proof cellophane in 1927. The latter type was especially adapted to the packaging of food products where protection against moisture loss or absorption was desired. That purpose, to be accomplished effectively, required a satisfactory seal for the cellophane wrapping. None was available. Instead, a confectioner's fold with a paper or rubber band was employed. Its search for such a seal led DuPont in 1926 to send samples of moisture-proof cellophane to various adhesive manufacturers. It tried itself to develop such a seal but met with two obstacles which it could not surmount— bad odor of the adhesive and excessive dwell time for the adhesive to take hold.

DuPont's adhesives chemist worked on the problem but the possibility that the solution lie in development of a pressure-sensitive cellophane-backed adhesive tape didn't occur to him. Self-deprecatingly he testified, "Somebody asked me why didn't it and I said I was too dumb".

Then came Drew who, although he refers to himself as a "tinkering fool" and "more of a cook than a chemist", had already invented paper-backed masking tape. In June or July 1929 a paper jobber faced with the problem of producing a wrapper sufficiently waterproof to withstand submersion in water for a given time sought Drew's aid. About the same time Drew's superior, in quest for a wrapping which would keep moisture from rolls of masking tape obtained a quantity of waterproof cellophane from DuPont. This was Drew's first introduction to cellophane and he promptly related moisture-proof cellophane to the problem which the paper jobber had presented to him. He "smeared" some adhesive on a strip of the cellophane and through trial and error ultimately evolved a theretofore unknown article—cellophane-backed pressure-sensitive adhesive tape, aggressively and permanently tacky when fully dried, with an adhesive layer more highly cohesive than adhesive which could be wound and unwound and removed from surfaces without delamination or offsetting of adhesive. It filled the need for the satisfactory seal DuPont was looking for and introduced a new kind of tape of such inherent merit and versatility as to become commonplace in the home and office.

DuPont had every incentive to come upon the article disclosed in the Drew patent. Notwithstanding that it had available to it the materials, the scientific personnel and the consultation of Brandenberger, one of the earliest pro-

**2.** See also Landis Mach. Co. v. Parker-Kalon Corp., 2 Cir., 1951, 190 F.2d 543, 546, per L. Hand, J.: " * * * [We] have over and over again resorted to the history of what went before, the duration of the period during which the invention was needed but failed to appear and its acceptance when it did. These circumstances have seemed to us, not indeed an absolute determinant of invention, for there is none; but at least the best, and indeed almost always the only, rational approach to a solution."

ducers of cellophane and the patentee of the patent strenuously urged here as anticipation of the Drew invention, it failed to make Drew's discovery.

It cannot successfully be controverted that prior to the advent of the article disclosed in the patent, cellophane had not been used as a backing in combination with an aggressively tacky and strongly cohesive rubber-resin type adhesive. The prior self-adhering normally tacky adhesive tapes had a cloth or paper backing. The tacky adhesive penetrated the surface of the backing and obtained a mechanical anchorage due to the porosity and fibrous nature of the backing. The non-adhesive surface was not flat and consequently when the tape was wound in a roll there were only points of, rather than total, contact with the pressure-sensitive adhesive. Because there was a mechanical differential and an area differential between the two sides of the tape the roll could be unwound without delamination of the adhesive. Persons skilled in the adhesive tape art were committed to the thinking that mechanical anchorage was a *sine qua non* of an acceptable non-delaminating and non-offsetting adhesive sheet or tape. Drew also was of that mind on May 28, 1928 as evidenced by the caveat contained in the application he filed on that date for his masking tape patent, viz., "An over-sufficient saturation of the paper will render the surface unfit for subsequent coating * *" U. S. Patent 1,760,820, p. 5, lines 124–126.

█ It may be that Drew employed a backing with a non-fibrous surface contrary to the precepts of the art precisely because he was "more of a cook than a chemist". That a person having ordinary skill in the art would "know better" than to attempt it does not negative patentability.[3] In retrospect, it would seem that what Drew did was simple and no more than the obvious. "Its simplicity should not blind us as to its character.

Many things, and the patent law abounds in illustrations, seem obvious after they have been done * * *. Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention." Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 434–435, 31 S.Ct. 444, 447, 55 L.Ed. 527. See also Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.

The claims in the Drew patent meet the "rather severe test" and conform to the standard of invention for combination patents enunciated in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra [340 U.S. 147, 71 S.Ct. 130]. Whether 35 U.S.C.A. § 103 lowered the standard of invention is an inquiry, therefore, which need not be pursued in this case. Vermont Structural Slate Co., Inc., v. Tatko Bros. Slate Co., Inc., 2 Cir., 1956, 233 F.2d 9. Compare Welsh Mfg. Co. v. Sunware Products Co., 2 Cir., 1956, 236 F.2d 225; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 535, 536, certiorari denied 1955, 350 U.S. 911, 76 S.Ct. 193, and L-O-F Glass Fibers Co. v. Watson, 1955, 97 U.S.App.D.C. 69, 228 F.2d 40, with Wasserman v. Burgess & Blacher Co., 1 Cir., 1954, 217 F.2d 402; Interstate Rubber Products Corp. v. Radiator Specialty Co., 4 Cir., 1954, 214 F.2d 546; General Motors Corp v. Estate Stove Co., 6 Cir., 1953, 203 F.2d 912, and Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846.

"Scotch Brand Cellophane Tape" has achieved phenomenal commercial success. The first year it was on the market sales were upwards of $100,000 without any advertising expense. Within ten years annual sales had increased

---

3. "Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C.A. § 103.

█

to over $5,500,000—advertising expense throughout this period was slightly less than 3% of sales. The wide acceptance of the product attests to its need and reflects its worth. If it can be said that the question of patentable invention in this case is a close one the very substantial commercial success enjoyed by the patented article "tips the balance" on that issue. See Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235.

As already noted the Drew Patent has been thrice adjudged valid. Implicit in said determinations is the finding that Drew's invention displays sufficient "inventiveness" to constitute a patentable advance over the art. The facts established on the trial herein support that holding.

Technical Tape pleaded or noticed forty-six references to patents and publications in support of its contention that the product claimed in the Drew Patent had been patented and described by others before Drew claims to have invented it. By pre-trial stipulation plaintiff reduced said references to the following nineteen:

### Foreign Patents

1. Brandenberger 433,999 (French) delivered November 13, 1911, published January 20, 1912.

2. Kronstein 112,237 (Austrian) granted August 15, 1928, published February 11, 1929.

3. Kronstein 656,582 (French) granted January 2, 1929, published May 10, 1929.

4. Kronstein 293,293 (British) accepted March 14, 1929.

5. Grossman 372,925 (German) granted February 10, 1920, published April 3, 1923.

6. Liesegang 440,712 (German) February 10, 1927.

7. Liesegang 253,940 (British) June 19, 1926.

8. Rado 682,785 (French) granted June 2, 1930, application filed October 4, 1929.

### United States Patents

9. Kronstein 1,944,562 granted January 23, 1934, application filed March 13, 1928.

10. Hodgson 1,467,108 granted September 4, 1923.

11. Mantell 1,850,760 granted March 22, 1932, application filed March 21, 1929.

12. Zimmerli 1,892,123 granted December 27, 1932, application filed April 12, 1928.

13. Teague 1,746,875 granted February 11, 1930, application filed June 9, 1924.

14. Mealy, 1,752,557 granted April 1, 1930, application filed February 13, 1925.

15. Charch 1,737,187 granted November 26, 1929, application filed January 3, 1927.

16. Carrington Re. 3,260 granted January 12, 1869.

17. Drew 1,760,820 granted May 27, 1930.

18. Drew Re. 19,128 granted April 3, 1934.

### Publication

19. Article entitled "Pearson's Crude Rubber Compounding Ingredients", published 1918 by India Rubber Publishing Co., Inc., Page 372.

The publication and each of the patents referred to as prior art, or the corresponding one of another country,[4] was before either Judge Barnes in Minnesota Min. & Mfg. Co. v. International Plastic Corp., supra, or in Minnesota Min. & Mfg. Co. v. Pax Plastics Corp., supra, or Judge Campbell in Minnesota Min. &

---

4. It is not disputed that (i) the three Kronstein foreign patents contain no disclosure not present in the Kronstein U. S. patent; (ii) the Liesegang German Patent corresponds to the Liesegang British Patent specifications; (iii) Drew 1,760,-820 corresponds to Drew Re. 19,128; and (iv) Rado French Patent 682,785 is essentially the same as Rado British Patent 344,469.

Mfg. Co. v. Neisner Bros., Inc., supra, and was found not to anticipate the disclosures of the claims in suit. In the International and Pax suits U. S. Patent 1,850,760 to Mantell and 1,760,820 to Drew were stressed. On appeal it was held that the Mantell Patent did not relate to the adhesive tape art and that the finding of the District Court that the claims of the Drew Patent in suit were not anticipated by, and defined invention over, the Drew masking tape patent was fully supported by the evidence. In the Neisner case the Court noted that although the Brandenberger French Patent 433,999 had not itself been before the courts of the Seventh Circuit when the validity of the Drew Patent was sustained, similar patents, to wit, those issued to Kronstein, were considered and distinguished from the Drew Patent.[5]

In the instant case the emphasis seems to be on the Brandenberger French Patent, the Rado French Patent and the Kronstein Patents. In considering the disclosures made by these patents they are, of course, to be read unaided by the teachings of the patent which it is urged they anticipate. So viewed, Brandenberger's invention clearly relates exclusively to an insulating substance. His concern was with increasing the electrical resistance of cellulosic films or sheets. To achieve this objective he disclosed: first, the need for closing the microscopic pores which might be present in the film; second, that one of the ways of effecting such closure would be by coating the sheets with one or several layers of linseed oil, with a rubber solution, with any insulating varnish or with a mixture of these substances; third, that a closure of the pores could be obtained by bonding together two or more sheets of cellulose since the location of the pores would not coincide in the various sheets and thus an absolutely homogeneous surface would be obtained; fourth, that the sheets could be bonded by means of any adhesive substance, but, in order to increase their electrical resistance, the sheets could be coated first with linseed oil, a solution of rubber or any insulating varnish which themselves could serve as adhesives; and finally, that cellulose sheets which had been treated in such a process so as to present a surface coated with fatty ethers of cellulose, either nitrated or acetylated superficially, could be used instead of ordinary cellulose sheets. Such superficial etherification would result in a type of varnish which envelops the cellulose sheet closely with an insulating layer free from any porosity and the sheet thus obtained could be used as such, as an insulating material, or they could be bonded to each other and coated like sheets of pure cellulose.

██ The primary function of the coating in the Brandenberger Patent is to close the pores in the cellulosic sheet and to increase its electrical resistance. The reference to the coating as an adhesive to bond the sheets is quite incidental—witness the omission of any suggested formulation for the adhesive substance or any reference to the purpose thereof other than to bond the sheets with the limited objective already indicated. "Any adhesive substance", Brandenberger pointed out, could be used. Accordingly he did not specify the recipe of the adhesive substance nor even mention whether it was to be normally tacky and pressure-sensitive or otherwise. Moreover the desirability of a substance which was more cohesive than adhesive was not presented since it was not contemplated that the sheets once bonded would be separated. Nor can it be said that Brandenberger unwittingly disclosed an adhesive which was normally tacky and pressure-sensitive and more cohesive than adhesive although he did not require or seek it. To constitute an anticipation the disclosure of prior art must be clear and certain. Trussel Mfg. Co. v. Wilson-Jones Co., 2 Cir., 1931, 50 F.2d 1027. The prior patent, especially if it is of

5. See note 8, infra.

foreign issue, must teach the invention with sufficient clarity and explicitness to enable a person skilled in the art to understand its nature and carry it into practical use without the necessity of experimentation. Allied Wheel Products v. Rude, 6 Cir., 1953, 206 F.2d 752; Hollywood-Maxwell Co. v. Street's Of Tulsa, 10 Cir., 1950, 183 F.2d 261; Wisconsin Alumni Research Foundation v. George A. Breon & Co., 8 Cir., 1936, 85 F.2d 166, certiorari denied 1936, 299 U.S. 598, 57 S.Ct. 191, 81 L.Ed. 441; Donner v. Sheer Pharmacal Corporation, 8 Cir., 1933, 64 F.2d 217, certiorari denied 1953, 290 U.S. 658, 54 S.Ct. 73, 78 L.Ed. 570. Even after the need for a cellophane tape with a coating of a normally tacky and pressure-sensitive adhesive became apparent, Brandenberger, despite his extensive research and pioneering efforts in the devolopment and manufacture of cellophane [6] and his then role as consultant to the Cellophane Division of DuPont, failed to discern in his own patent what plaintiff's expert now claims was apparent to anyone ordinarily skilled in the art. It would serve no useful purpose to probe into the relative skill in the art of Brandenberger and plaintiff's expert. The Court is persuaded that the vision of the latter was substantially brightened by his diligent study of the teachings of the Drew Patent, and that absent the wisdom thus acquired what is now asserted to be clear would have been as obscure to him as it was to Brandenberger and DuPont's adhesives chemist. Unless the disclosures of the Drew Patent are read into the Brandenberger Patent the only substantial similarity between them is that they each use cellulosic film. Plaintiff's brief argues what indeed is the established law, that the discovery of a new use for an old article does not justify the granting of a patent. Here, however, we find not a new use but a new article possessing characteristics and functional utility totally lacking in the old.

■ Plaintiff would have the Court read the Brandenberger Patent in the light of alleged admissions made by 3 M in proceedings before the German Patent Office opposing the grant of a patent to one Rado. The disclosures in the Brandenberger Patent are to be gleaned from the patent itself—they cannot be extended or limited by argument or statements made by or on behalf of third persons in proceedings which do not involve the patent and to which the patentee is not a party. As an aid in interpreting the clear and unambiguous language of the Brandenberger patent they have no probative force. Neither can they be availed of to supply disclosures which are lacking therein. Furthermore, what are relied on as admissions against interest are at best arguments of counsel [7] which examined in their entirety cannot be construed as at variance with the position of 3 M in this case.

Judge Barnes' findings in the Pax case, supra [8] with respect to the Kron-

6. By way of reference to the role of Brandenberger in the development of cellophane, see discussion in United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994.

7. Counsel's expression of opinion do not constitute admissions against interest. Martin v. Burgess, 5 Cir., 1936, 82 F. 2d 321.

8. In the Pax case, supra, 65 F.Supp. at page 308, the Court found: "The Kronstein U. S. patent 1,944,562 and the equivalent British patent 293,293, do not anticipate the products of the claims in suit. They relate to an electrical insulating band or ribbon which is asserted to improve upon the prior art by using a backing of non-fibrous cellulose film (cellophane) in place of cloth or paper, and which (as in the prior art) is coated with insulating material such as rubber, linoxyn, nitro-cellulose varnish, etc. The cellophane may be coated on one or both sides, and one coating may serve as a so-called adhesive. There is nothing to suggest that the phrase 'any desired degree of adhesiveness' (page 2, col. 2, lines 34–39) implies a normally tacky and pressure-sensitive adhesive condition. The term 'adhesive' is very broad and applies to normally non-tacky adhesives (such as those of postage stamps). The coatings of these patents may retain some wet ad-

stein Patent are fully supported by the evidence in this case. Plaintiff suggests that "Judge Barnes did not have the benefit of the evidence here, such as the proof that the *inherent* property of a rubber solution is to form a normally tacky and pressure-sensitive adhesive when dried and Tierney's (defendant's expert) admission that the Kronstein coatings would produce a tacky or adhesive coating." A careful study of the record leads the Court to the conclusion that the alleged deficiency in the proof before Judge Barnes has not been supplied here.

██ Plaintiff's reliance on Rado French Patent 682,785, issued on February 18, 1930 and published on June 2, 1930, as prior art is necessarily grounded on the premise that the Drew Patent is not entitled to an effective filing date of May 1, 1931. Plaintiff recognizes that a true divisional application is entitled to the filing date of its parent but urges that Drew's subsequent application cannot be accorded the benefit of the earlier filing date because the disclosures in the earlier application were inoperative. The evidence is clearly to the contrary. Examples C and D in the 1931 application were operative. An article made in conformity with example C was commercially produced by 3 M between November 1930 and August 1931 and plaintiff's expert successfully made tapes following said examples.

Section 102 of Title 35 provides that "A person shall be entitled to a patent unless * * * (b) the invention was patented or described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States * * *." With respect to applications filed before August 5, 1940 and patents granted thereon, however, the applicable period is two years. Pub.Law 593, 82d Cong., 2d Sess., § 293, Sec. 4(d), 66 Stat. 815,

July 19, 1952, 35 U.S.C.A. note preceding section 1. Under the circumstances the Rado Patent does not constitute a statutory bar.

The Court has examined the publication and the remaining patents referred to as prior art and compared each with the patent in suit. It is apparent that the Drew Patent is sufficiently distinguished from them.

The determination that the Drew Patent is entitled to a 1931 filing date is dispositive of the principal ground urged by Tech Tape in support of its contention that the invention was in public use more than two years prior to the date of the application for patent. The public use upon which reliance is placed is a sale on December 5, 1930 by 3 M to Shellmar Products Co. Plaintiff asserts that the subject of the sale was made in conformity with Example E which was first disclosed more than two years thereafter in the 1933 application. The evidence does not sustain this allegation. It establishes that the adhesive on the article sold to Shellmar was not materially different from Example C in the 1931 application.

It is asserted that Drew is not the true inventor of the patent in suit. Admittedly, Drew did have other hands help him in the manual work incident to following through his ideas and conceptions, but aid thus rendered does not elevate the helpers to the rank of inventors or co-inventors nor alter Drew's status as the sole inventor. The others worked with Drew and under his direction but made no contribution beyond physical assistance. The inventive genius resided in Drew alone.

██ Tech Tape's position that Claim 9 of the patent is void for want of utility or operability is not well founded. Lack of commercial success per se does not establish lack of utility. O'Donnell v. United Shoe Machinery Corporation, D.C.D.Mass.1933, 2 F.

hesiveness temporarily, but in a short time dry out to a non-tacky condition. When Kronstein uses rubber solution, he obtains a frisket cement type of coating like Mantell."

Supp. 178. Defendant established that it manufactured the article described in Claim 9 and that sometimes it performed satisfactorily and at other times it did not. Absent proof of total incapacity the defense of non-operativeness or non-utility is not available. National Slug Rejectors v. A. B. T. Mfg. Corporation, 7 Cir., 1947, 164 F.2d 333, certiorari denied 1948, 333 U.S. 832, 68 S.Ct. 459, 92 L.Ed. 1116; Emery Industries v. Schumann, 7 Cir., 1940, 111 F.2d 209; In re Oberweger, 1940, 115 F.2d 826, 28 C.C.P.A., Patents, 749; Walker, Patents, § 67 (Deller ed. 1937).

The charge of double patenting has not been substantiated. The Drew Masking Tape patent refers to an adhesive sheet as a new article of manufacture comprising a unified paper backing with a pressure-sensitive adhesive coating united to one surface thereof. The patent in suit discloses as a new article of manufacture a non-fibrous sheet. The difference is not merely semantic. As has already been indicated the art prior to the Drew Patent led away from cellophane—a fiber free film—as a backing for a pressure-sensitive normally tacky non-offsetting and non-delaminating adhesive tape. The article of the Drew Patent was unknown to the inventor when he filed his application for the Masking Tape patent and is not disclosed therein. The substantial dissimilarity of the claims in the two patents conclusively refutes the suggestion of double patenting. Western Electric Co. v. General Talking Pictures Corp., 2 Cir., 1937, 91 F.2d 932, affirmed 1938, 304 U.S. 175, 546, 58 S.Ct. 849, 82 L.Ed. 1273.

Plaintiff's final ground of asserted invalidity is that the patent fails to make the "full, clear, concise, and exact" description of the alleged invention required by 35 U.S.C.A. § 112. Testimony of Tech Tape's expert that he successfully made tape with the formulae set out in Examples C, D and E demonstrates that the specification of the invention and the manner and process of making any use of it is sufficient to enable a person skilled in the art to which the invention pertains to make and use the same. No more is required. A similar claim of non-compliance with the statutory standard for clarity and exactitude was treated at some length and rejected in the International case, 159 F.2d 554, 558. The later decision of the Supreme Court in Faulkner v. Gibbs, 1949, 338 U.S. 267, 70 S.Ct. 25, 94 L.Ed. 62,[9] and 35 U.S.C.A. § 112,[10] effective January 1, 1953, underscore the soundness of that determination.

The contention of 3 M that the accused product infringes is resisted by a demonstration of the absence of outright duplication. That Tuck Tape is substantially identical with the tapes which were held as infringements of the Drew Patent in the Pax and Neisner cases, supra, is admitted in the pleadings. Indeed, in its brief plaintiff admits that if its product had been before the Court in either of said cases it would have been adjudicated an infringement. The accused product serves the identical purpose and in exactly the

9. As was argued in the International case, Tech Tape, urges that the claims of the Drew Patent do not meet the requirements of Halliburton Oil Well Cementing Co. v. Walker, 1946, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. In discussing Halliburton the Supreme Court stated in Faulkner v. Gibbs: "We there held the patent invalid because its language was too broad at the precise point of novelty. In the instant case, the patent has been sustained because of the fact of combination rather than the novelty of any particular element." The same may be said of the patent in suit.

10. Section 112 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claims shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The language of the Act suggests a greater liberality in the use of functional expressions in combination claims. See Commentary on The New Patent Act, 35 U.S.C.A., p. 25.

same manner as does Scotch Brand Cellophane Tape. The two products look alike and for all practical purposes cannot be distinguished except by a trained chemist. Tech Tape simulates as best it can the dispensing and marketing techinques employed by 3 M. The difference between the two products resides solely in the composition of the adhesive. Tech Tape claims to have employed two kinds of adhesive; one of rubber-resin and the other made from polyvinyl ether polymers which is all synthetic resin and has no rubber. As to the former the distinction claimed is in the type of rubber and resin used; with respect to the latter that it is all synthetic resin and no rubber. The substituted components of the adhesive serve the same functions and have the physical properties characteristic of the pressure-sensitive adhesives of the "rubber-resin" type suggested in the patent. Some of the claims of the patent call for "rubbery base" adhesive, others for a "rubber-resin" type adhesive, and others merely for a non-offsetting normally tacky and pressure-sensitive water insoluble transparent flexible adhesive coating. As Judge Campbell stated in the Neisner case, supra, 101 F.Supp. at page 928:

> "The normal construction of the expression 'rubbery base' is that the product is similar to rubber at least in some of its physical properties as, for example, in its elasticity, stretchiness and the like. The adhesive coating of the accused tape clearly fulfills such a description. Similarly, the term 'rubber-resin type' adhesive properly indicates an adhesive having the physical properties of rubber-resin adhesives, which properties defendant's coating patently possesses. Furthermore, the use of 100% resin, natural or synthetic, rather than the suggested proportions of rubber and resin as described in the Drew patent, might be more accu-

rately denoted as merely a change in degree rather than in kind."

■ Infringement cannot be avoided by the mere introduction of minor variations nor by the use of equivalents which function similarly as the original. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, rehearing denied 1950, 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed 620; Finkelstein v. S. H. Kress & Co., 2 Cir., 1940, 113 F.2d 431.

■ By way of reply to 3 M's counterclaim for an injunction against further infringement and damages Tech Tape asserts that 3 M has unlawfully attempted to extend its patent monopoly of cellophane tape to cover products not covered by any valid claim thereof. It seeks to invoke the doctrine enunciated in Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, that a court of equity will not lend its aid to protect a patent monopoly when the patentee is using it as an effective means of restraining competition with its sale of an unpatented article. To prevail in this position, therefore, Tech Tape must establish that 3 M used the Drew Patent in an attempt to monopolize the sale of unpatented tapes or to gain some market or other advantage over other competitors in the field of the unpatented article. Automatic Radio Mfg. Co., Inc., v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, rehearing denied 1950, 340 U.S. 846, 71 S.Ct. 13, 95 L.Ed. 620. Short of a refusal to sell its Scotch Brand Cellophane Tape unless the purchaser also bought its unpatented tapes, or a refusal to sell unpatented tapes unless the purchaser deals in Scotch Brand Cellophane Tape to the exclusion of cellophane or other tapes of other manufacturers, the Morton Salt case doctrine is inapposite.

There has been a complete failure of proof that the sales policy of 3 M falls within the interdicted conduct. 3 M

distributes its products through upwards of 30,000 outlets. Included among them are more than 6,000 paper wholesalers and 4,000 commercial stationers. Many thousands of 3 M's distributors and jobbers handle competitive tapes and 3 M has never required either that they handle its tapes exclusively or as a condition of buying one type of tape that they also buy any other. A large percentage of distributors identified by the President of Tech Tape as 3 M distributors in the New York area are, according to his testimony, also distributors of Tech Tape's products. He further testified that many Tech Tape jobbers or distributors also handle 3 M products. Of the large number of 3 M distributors over the approximately three-year period preceding the trial Tech Tape points to seven, who in the aggregate account for a relatively minutial portion of the total 3 M tape business, to establish its contention. The situation with respect to each of these seven distributors has been considered and the Court is satisfied that the conduct of 3 M in each instance was motivated solely by honest business considerations in no wise related to an attempt to extend the monopoly of the Drew Patent.

█ The Drew Patent is valid and infringed. A decree for an injunction and an accounting may be submitted in accordance with this opinion. Decision on whether the damages found should be increased pursuant to 35 U.S.C.A. § 284 is deferred until the coming in of the Master's report. See Patterson-Ballagh Corp. v. Moss, 9 Cir., 1953, 201 F.2d 403, 408, and cases cited.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Federal Rules of Civil Procedure rule 52(a), 28 U.S.C.A.