**TECHNICAL TAPE CORPORATION,**
Plaintiff-Appellant,

v.

**MINNESOTA MINING & MANUFAC-
TURING COMPANY,** Defendant-
Appellee.

No. 337, Docket 24207.

United States Court of Appeals
Second Circuit.

Argued April 12, 1957.

Decided Aug. 2, 1957.

Mandate Recalled Nov. 8, 1957.

See 249 F.2d 1.

**344**

Daniel L. Morris, Curtis, Morris & Safford, New York City (Simon H. Rifkind, Samuel J. Silverman, Edward N. Costikyan, Emanuel E. Sternfield, Robert D. Spille and John A. Mitchell, New York City, of counsel), for plaintiff-appellant.

H. H. Hamilton, New York City (Harold J. Kinney and Robert I. Coulter, St. Paul, Minn., M. K. Hobbs, Platteville, Wis., and Edward A. Haight and J. W. Hofeldt, Chicago, Ill., of counsel), for appellee.

Before MEDINA and WATERMAN, Circuit Judges, and LEIBELL, District Judge.

LEIBELL, District Judge.

Plaintiff instituted this action on November 17, 1951, under the Declaratory Judgment Act (28 U.S.C. § 2201) to have the defendant's patent No. 2,177,627, issued to Richard Drew October 31, 1939 [1] declared invalid, or, if valid, then not infringed. On a motion in the District Court the complaint was dismissed on the grounds that no justiciable controversy was stated upon which a claim for relief could be founded and that the court lacked jurisdiction. On appeal, this court (200 F.2d 876) reversed and held that an amendment to the complaint in the interest of clarity, should be allowed. Then followed various procedural steps, resulting in an amended complaint, a supplemental complaint, the defendant's answer and plaintiff's reply. In its answer Minnesota set up a counterclaim for an injunction against further infringement of its patent by plaintiff, and for damages. Plaintiff's reply charged a misuse by defendant of its patent, in that defendant allegedly attempted to extend its patent monopoly to cover unpatented products, that defendant illegally restrained competition, and for those reasons a court of equity should not grant defendant any relief on its counterclaim.

The trial of this case before Judge Bicks took five weeks. On July 18, 1956, he filed his opinion (143 F.Supp. 429) and on July 26th signed a judgment. The judgment declared that (a) all of the sixteen claims of the Drew patent are valid "except claim 9 as to which no adjudication of validity is made, no infringement of said claim having been found"; that (b) the plaintiff had infringed all the claims of the patent (except claim 9); that (c) defendant had not been guilty of inequitable conduct and was not barred from enforcing the patent; that (d) an injunction should issue enjoining and restraining the plaintiff from making or selling any transparent or colored non-fibrous, film-backed pressure-sentitive tape or sheeting embodying the invention of Letters Patent No. 2,177,627; that (e) defendant recover of the plaintiff the damages which defendant had sustained by reason of the aforesaid infringement; and that (f) plaintiff's complaint, amended complaint and supplemental complaint be dismissed with costs.

The patent expired October 31, 1956. Plaintiff-appellant has filed a substantial bond for any damages ultimately awarded.

1. The opening paragraph of Drew's patent No. 2,177,627 states:
 "This invention relates to adhesive sheets having a backing with a non-fibrous surface (such as normal or waterproofed films of regenerated cellulose) and a coating of normally tacky and pressure-sensitive adhesive united thereto. While not limited thereto, the invention relates especially to transparent adhesive sheets, to adhesive sheets in the form of adhesive tapes which may be sold in stacked or coiled form, and to adhesive sheets or tapes which are well adapted to the sealing or securing of wrappers composed of non-fibrous lustrous cellulosic films and the like."
 The adhesive tape made by defendant under the Drew patent is familiarly known as "Scotch" cellophane tape.

On this appeal Technical Tape contends (1) that there was no "invention" in what Drew did (Drew II patent, No. 2,177,627); (2) that there was no novelty in what Drew did because other patents anticipated Drew; (3) that plaintiff, Technical Tape, did not infringe the Drew II patent; (4) that Minnesota has abused whatever patent rights it may have had and is entitled to no relief.

 Every judge before whom the validity of the Drew II patent (No. 2,-177,627) was litigated in the District Court (Judges Barnes and Campbell in the Northern District of Illinois and Judge Bicks in the Southern District of New York) has held the Drew II patent valid. Judge Sparks and Judge Minton of the United States Court of Appeals (7th Cir.) and Judge Baltzell, a District Judge who sat with them and heard the appeals from the judgments entered on the decisions of Judge Barnes upheld the validity of the Drew II patent (159 F.2d 554). We have considered the evidence in this case on the issue of validity and we are convinced that Judge Bicks' finding of invention and validity should be sustained.

Judge Barnes in Minnesota Mining & Mfg. Co. v. Pax Plastics Corp., D.C., 65 F.Supp. 303, 306, summarizes the salient features of the Drew II patent,[2] as follows:

2. The Drew II patent (No. 2,177,627) after briefly describing the invention in its opening paragraph (footnote 1), mentions the packaging problems which it would help solve. Those problems arose from the use of "packaging and wrapping sheets composed of thin, transparent and flexible non-fibrous films" and the need for sealing or fastening the sheets with proper adhesives, a need which the old conventional adhesives could not meet because of "the nonporous or highly glazed surfaces provided by this type of sheet material" which is transparent and waterproof.

The patent then goes on to describe how, under Drew's invention, the sheets of film material "are provided with coatings of normally tacky and pressure-sensitive adhesive firmly united thereto." These and other characteristics of the adhesive are discussed in the patent as follows:

"By 'normally tacky and pressure-sensitive' it is meant that under ordinary atmospheric conditions the adhesive is stably in a condition such that it does not need to be activated by solvents or heat or otherwise prepared in order to secure good adherence to surfaces against which the adhesive coating (with its backing) may be pressed when used. An adhesive coating is provided which enables the adhesive sheeting to be affixed to smooth lustrous surfaces, such as non-fibrous cellulosic surfaces of wrapping or packaging sheets or films. An object of the invention is to provide a unified adhesive coating possessed of such coherence in relation to adhesiveness and so firmly united to its backing that the adhesive sheet may be stripped from smooth non-fibrous surfaces (not possessing special chemical affinity for the adhesive), to which it may have been temporarily applied, without offsetting of adhesive material. Hence the adhesive coating may be termed 'non-offsetting,' and this expression designates an important physical or physico-chemical property or characteristic of the adhesive coating, namely, that its coherency is greater than its adhesiveness. Further, an object is to provide adhesive sheets having an adhesive coating that is in elastic equilibrium with its backing so that warping and curling of the sheet, and blistering of the adhesive coating, are avoided."

The drawings accompanying the patent show three figures, which are described on page 1 of the patent as follows:

"Fig. 1 shows a roll of adhesive tape, the tape having a non-fibrous film backing provided with a water-insoluble normally tacky and pressure-sensitive adhesive coating, which may be unwound without delamination or offsetting of adhesive;

"Fig. 2 is a diagrammatic cross-sectional representation of a construction in which a primer coating is interposed between the backing film and the normally tacky and pressure-sensitive adhesive coating; and

"Fig. 3 is a corresponding representation in which the primer coating is omitted."

The patent sets forth various compositions of the adhesive—Examples A and B can be used "where transparency of the adhesive tape is not of major importance"; Example C, "where it is desired to obtain a clear composite of backing material and adhesive"; Example D, "where lack of transparency is not objectionable and the addition of a colored hue to the composite of backing and adhesive material desirable." And where

"The claims in suit are drawn to a new kind of adhesive sheet or tape having a field of utility not possessed by any prior adhesive tape of any kind. Whether transparent or colored, and whether involving a primer or not, this tape is stably and agressively tacky and seals instantly on contact with almost any surface, without moistening or heating. The backing is a thin transparent film having smooth, glassy surfaces, such as cellophane. Both the colored and transparent types have been widely used for sealing packages. The colored type provides an attractive

"maximum transparency and the highest possible bond strength and firmness" are sought, a composition described in Example E is recommended.

The patent further explains how—

"In making the adhesive, the rubber base and the resin base determine the tackiness exhibited by the finished product. This relationship, also coupled to a certain extent with the treatment given to the rubber, determines this factor.

"In producing a clear adhesive, the relationship of platicizer (above listed in the form of liquid paraffin oil) and resinous material may be considered as constituting the tack producing phase of the adhesive and up to a certain point the greater the quantity of the tack producing phase that is added to the rubber, the greater the tackiness exhibited in the rubber base adhesive."

The patent also states how the materials for the formulas are to be prepared and the various steps and methods to be followed in obtaining the proper mixture for the adhesive. The patent then describes the methods to be followed in applying the adhesive to celulous sheet backing.

"In use, the adhesive as above described may be directly applied to the backing or sheets of transparent gelatinized cellulosic materials, previously enumerated, and forms a desirable product.

"Where considerable unification is desired between the adhesive layer and the backing material, to assure proper anchorage of the adhesive layer with the backing material, thereby assuring satisfactory unwinding or separation when the composite is formed into rolls or stacks, it is preferred to first coat the sheet of gelatinized cellulosic material with a priming composition. Priming on one surface is particularly effective with sheets formed of regenerated cellulose. The priming operation consists of first coating the backing material before application of the adhesive materials previously described."

Five different formulas for the primer, when used, are described and discussed in the patent. A primer coating is mentioned in Claim 10 but not in Claim 4.

Claim 4 of the patent states:

"4. A transparent adhesive sheet comprising a non-fibrous transparent flexible film backing having non-porous surfaces and a water-insoluble normally tacky and pressure-sensitive transparent flexible adhesive coating, said adhesive coating being firmly united to said backing and the adhesive and backing being of such kinds that the back surface of the backing is inactive to the adhesive coating to a degree permitting unwinding of the adhesive sheet from rolls thereof without delamination or offsetting of adhesive."

Claim 10 states:

"10. An adhesive sheet comprising a transparent flexible non-fibrous film having non-porous surfaces, a coating thereupon of a non-offsetting transparent normally tacky and pressure-sensitive water-insoluble adhesive, and an interposed transparent primer coating unified both to said surface and to said adhesive coating, the composite sheet being transparent and its parts so firmly united that it may be unwound from rolls thereof without delamination or offsetting of adhesive."

Claim 4 is typical of Claims 5, 6, 8 and 15; and Claim 10 is typical of Claims 11 and 16. Claims 13 and 14 provide for the use of coloring material in the adhesive. Claims 15 and 16 provided also: "said adhesive sheet transmitting light so that the sheet will not conceal the coloring or markings of surfaces to which applied."

The type of sheet is a sheet of cellophane; the type of adhesive is a "water-insoluble normally tacky and pressure-sensitive transparent flexible adhesive coating" (the formulas are described in the patent) which when applied to the front surface of the film backing becomes firmly united to it, and is of such a kind that the sheet can be wound, and the back surface of the backing is inactive to the adhesive on the front surface to a degree that, when the sheet is unwound, none of the adhesive is offset or becomes attached to the back surface of the film backing, because the cohesiveness of the adhesive coating is greater than its adhesiveness.

decorative seal for packages and has also been widely used as a coding tape for wires and tubes. The adhesive contains coloring material visible through the transparent film backing and produces the optical illusion that the backing film is colored, thus causing the back surface of the tape to have a lustrous colored appearance. The backing film protects the colored stratum from becoming smeared or dirty in use of the tape, and provides a back surface to which dirt does not readily cling. The transparent type of tape provides an 'invisible' sealing, mending and holding tape widely used for sealing packages, mending books, records, maps and charts, and fastening posters on windows and bulletin boards. Both types of tape have many other uses."

 The patent in suit is not invalid on the grounds that it is an aggregation of components that were old. Plaintiff contends that cellophane sheets were old and so was the use of rubber, resin, and rubber-resin adhesive; and that plaintiff's patent is simply an aggregation of the two. Plaintiff's premise does not fully state the facts and its conclusion is not correct. Defendant's aggregation of old elements produced a "new quality" and "function," and a new article. It contributed something not had before. It added "to the sum of useful knowledge." It required "more than ordinary mechanical skill" to produce it. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, at pages 151 and 152, 71 S.Ct. 127, at page 130, 95 L.Ed. 162. A novel combination of old elements which cooperate with each other so as to produce a new and useful result is patentable. Weller Mfg. Co. v. Wen Products, Inc., 7 Cir., 231 F.2d 795, 798; Brown v. Brock, 4 Cir., 240 F.2d 723, 726; Zonolite Co. v. United States, Ct.Cl., 149 F.Supp. 953, 955.

It is defendant's contention that Drew was the first to produce film backed, normally tacky, pressure-sensitive and water-insoluble adhesive sheets and tape, all of which is clearly and fairly defined in the specifications and claims of the Drew II patent.

The specifications of the Drew II patent use the words "adhesive sheets or tapes" in the first paragraph and many times thereafter, although the claims refer to adhesive sheets. The adhesive sheets of the Drew patent claims could be of any width, such as tape size material.

That Drew's patent involved invention is established in several ways. It had been sought by expert chemists of the DuPont Co. and of Johnson & Johnson, for a number of years, unsuccessfully. Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034; Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177. In his own experiments Drew stumbled upon it. Of course, after Drew's discovery it all seemed simple. With Drew's patent to point the way, infringing competitors would claim that it was so obvious that there really was nothing to it; that it did not require anything but mechanical skill and the use of known materials. But the demand had long existed; skilled men had sought to meet the demand without success. Inland Mfg. Co. v. American Wood Rim Co., 6 Cir., 14 F.2d 657, 659. In the recent case of Rohm & Haas Co. v. Roberts Chemicals, Inc., 245 F.2d 562 the Court of Appeals for the Fourth Circuit in reversing a District Judge's holding, 142 F.Supp. 499, that the patent in suit before him was invalid for anticipation, stated:

"Since Hester tried and succeeded where Tisdale and the duPont Company tried and failed, we may fairly conclude that the discovery was not obvious to persons skilled in the art."

██ The phenomenal success of the Scotch tape produced by the defendant under Drew's patent is not to be overlooked in considering the question of invention. The Seventh Circuit called it "quite astonishing." Drew had hit upon something that was useful in many industries in packaging and sealing their

products. Although commercial success is not decisive on the issue of invention it is a factor that should not be ignored. Wahl Clipper Corp. v. Andis Clipper Co., 7 Cir., 66 F.2d 162, 165.

In considering the issue of invention and "how far beyond commonplace contriving was the foresight necessary to think out the combination," the courts find it enlightening to resort to "the history of what went before, the duration of the period during which the invention was needed but failed to appear and its acceptance when it did." L. Hand, J., in Landis Mach. Co. v. Parker-Kalon Corp., 2 Cir., 190 F.2d 543, 546. "Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be servicable." Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937, 939.

The prior art on which plaintiff-appellant relies on this appeal as anticipating Drew II patent will now be discussed.

Plaintiff points to the *Brandenberger French patent* (No. 433,999, 1912,) as an example of the prior art that anticipated Drew. Brandenberger's French patent stated: "The (cellulose) sheets can be bonded by means of any adhesive substance, but, in order to increase their electrical resistance, they can be coated first with linseed oil, a solution of rubber or any insulating varnish. These coatings or varnishes can themselves serve as adhesives." Brandenberger, while a technical adviser of DuPont, never suggested that his French patent of 1912 would give DuPont the answer to its problem of getting a proper sealing medium for its cellophane. If any of his patents[3] had anticipated Drew, and if Drew merely made such advances over Brandenberger as anyone skilled in the art could have made, it is surprising that Brandenberger did not accomplish this himself. No one was in a better position to do so with his years of experience and all the research resources of DuPont within his reach.

The Kronstein patent (No. 1,944,562) was not mentioned in the opinion of the Seventh Circuit (159 F.2d 554), but it was later considered by Judge Campbell in the Neisner Bros. Inc. case (Minnesota Mining & Mfg. Co. v. Neisner Bros., D.C., 122 F.Supp. 752, 754). He noted the similarity between the Brandenberger French patent No. 433,999 and the Kronstein patent and found that it did not anticipate Drew II. The Brandenberger French patent was intended to increase the insulation feature of cellulose sheets when bonded together by an adhesive substance, which also filled the pores of the sheets. That Kronstein's ideas were quite similar to Brandenberger's is not disputed. Both dealt with the use of cellophane as an electrical insulation with an adhesive coating. Judge Campbell pointed out that the "problems which confronted Kronstein and Brandenberger were not the same as those which confronted Drew, and their inventions were designed for correspondingly different uses."

In the case at bar, the trial judge considered the Kronstein patent and quoted in a footnote to his opinion the finding of Judge Barnes in the Pax case (65 F.Supp. 303) as to the Kronstein patent for

3. The Brandenberger United States patent, No. 1,221,825, was withdrawn during the trial before Judge Barnes in the Pax Plastics Corporation case (65 F.Supp. 303, at page 305). It had been pleaded as anticipating Drew II in the International Plastic Corp. case, but Judge Barnes ruled otherwise. On appeal, the Seventh Circuit stated that it was convinced that the Brandenberger No. 1,221,825 patent did not in any way anticipate the disclosures of the Drew II patent. It appears from Minnesota's brief on appeal in the International Plastic Corporation case, supra, that the Brandenberger patent No. 1,221,825, issued in 1917, showed the use of an adhesive "to cement together a plurality of films in making a multi-layer photographic film," that "there was no disclosure of pressure-sensitive adhesives," and that it had nothing "to do with the adhesive tape art."

an electrical insulating band or ribbon. Neither the French Brandenberger patent nor the Kronstein patent anticipated the Drew II patent.

Plaintiff-appellant argues that the Hodgson patent No. 1,467,108 disclosed the subject matter of the Drew II patent and observes that it is not discussed in the opinion of the District Court in this case. But the District Judge stated in his opinion that he had examined the patents referred to as prior art and compared each with the patent in suit and that the Drew patent is sufficiently distinguished from them.

The Hodgson patent is for a "dental film mount" and was issued September 4, 1923. It states that "This invention relates to mounts for photographic films and particularly to mounts adapted to hold small dental Rontgenographic negatives so that they may be examined by transmitted light, and so that they may be readily filed." The mount has a window and the film, which is larger than the window opening, is attached to the back of the mount by an adhesive substance. The adhesive is referred to as a "slow-drying adhesive, the desired characteristic being that the adhesive shall remain 'tacky' for a very considerable length of time." The Hodgson patent also states that "While the particular composition of the adhesive is not of importance, it is preferably a composition of rubber and coal tar pitch with any suitable softener such as benzol, gasoline or chloroform."

The patent describes and shows the mount as consisting of two parts. The face sheet is an opaque fabric with an opening in it. The rear sheet is of opaque paper, with an opening in it slightly larger than the face sheet, so that a small margin of the face sheet is exposed all around the rear sheet, when covered by the face sheet. An adhesive is applied to all of the back of the face sheet and when the rear sheet is applied to the face sheet, it will stick to it and at the same time leave a small margin of the rear of the face sheet, with the adhesive thereon, exposed around the

opening. The negative may be pressed down from the rear around the aperture against the exposed small margin of the front sheet with the adhesive thereon, and is thus held in place—"but should it be desirable for any reason to remove the negative this can be done since it can be stripped from the adhesive without injury to its diagnostic value." That is so because the picture on the film is so centered that it does not reach to the outer parts of the film which were applied to the exposed adhesive part of the mount. What happens to the adhesive when the film is removed? Does some of it detach itself from the paper mount and adhere to the film? Does all the adhesive remain on the paper mount? Does all of it attach itself to the film? The patent is silent as to that. And Mr. Shalita, in explaining the Hodgson patent for the plaintiff, admitted that it did not say that the adhesive was non-offsetting or transparent.

The Hodgson patent in no way anticipated the Drew II patent. It does not teach what the Drew II patent taught, nor does it claim anything like what is claimed in the Drew II patent. A comparison of the claims of the two patents proves that absolutely.

Plaintiff complains that defendant's main answer to the Hodgson patent is to scoff at it. The fact is that in all the cases in the District Courts in which Hodgson has been cited as anticipating Drew II, it has been ignored by the courts, as not worthy of any discussion. The Seventh Circuit found no merit in the contention that Hodgson's patent anticipated the Drew II patent. And as defendant's counsel herein remarks "there is no evidence that anyone was ever inspired by it to conceive of Drew's entirely different product." We agree with the conclusion of the Seventh Circuit that the Hodgson patent did not in any way anticipate the disclosures of the claims in suit.

A basic difference between the *Drew I patent* (No. 1,760,820) and the Drew II patent (No. 2,177,627) is that the former applied an adhesive to a porous

backing such as "paper or similar fabric material," while the latter applied an adhesive to a non-fibrous film backing. Drew I also refers to a "unified cellulosic backing" which is defined as meaning "to include a web of fabric comprising paper chosen from the materials herein described including gelatinized cellulosic sheets such as parchmentized paper" and various other types of paper, treated with various compositions. Parchmentized paper is not transparent; and it is not non-fibrous or non-porous. No one of the six claims of the Drew I patent mentions a "film backing." In Drew II the term "film backing" is used in all the claims except 9 and 10. Claim 9 uses the expression "regenerated cellulose film," and Claim 10 a "non-fibrous film."

That plaintiff infringed the Drew II patent is clear from the supplemental complaint [paragraph 8(c)][4] and the Agreed Statement (Ex. B) [paragraphs 5(a), (b), (c) and 9].[5] The use of a primer is included in Claims 10, 11 and 16 of the Drew II patent. But the use of a primer is not essential to producing a satisfactory tape under the other claims of the patent (except Claim 9, not relied on by defendant).

The exception mentioned in paragraph 9 of the Agreed Statement limited that admission to the use by plaintiff, in one of its tapes, of an adhesive coating "prepared from polyvinyl ether rather than rubber and resin." The latter is a second type of accused tape, which used an adhesive very similar to that which Judge Campbell had before him in the Neiser case (101 F.Supp. 926, and 122 F.Supp. 752, 754). Even if the equivalent plaintiff used was unknown at the time of Drew's invention, it was none the less an equivalent and infringed—Finkelstein v. S. H. Kress & Co., 2 Cir., 113 F.2d 431, 433. The substitute functions in the same way as the original and produces the same result.

Judge Barnes had decided the suits of Minnesota against Freydberg and against Bulkley in Minnesota's favor on March 30, 1946, D.C., 65 F.Supp. 303, affirmed 7 Cir., 159 F.2d 554 on January 9, 1947. The tape they sold as Illinois distributors of Cofax was made by Cofax,

4. "8.(c) Defendant has brought suit in the District Court of the United States in Chicago, Illinois, against a number of parties for infringement of the said patent No. 2,177,627 by reason of the manufacture and/or use and/or sale of pressure-sensitive adhesive tapes and sheets substantially identical with or not materially different from those manufactured and/or used and/or sold by plaintiff herein. These suits are identified as follows:

"Minnesota Mining & Manufacturing Company v. Pax Plastics Corp., et al., Civil Action 45 C 846, reported at [D.C.] 65 F.Supp. 303; Minnesota Mining & Manufacturing Company v. International Plastic Corporation et al., Civil Action No. 44 C 202, reported at [D.C.] 62 F. Supp. 34 and at [7 Cir.,] 159 F.2d 554, and Minnesota Mining & Manufacturing Company v. Neisner Bros., D.C.N.D.Ill. E.D., Civ. Action No. 51 C 1789, filed November 7, 1951." [This is reported at D.C., 101 F.Supp. 926 and at D.C., 122 F.Supp. 752.]

5. "5. Tech. Tape admits that, prior to the time the complaint was filed, it made, used and sold transparent non-fibrous film-backed pressure-sensitive adhesive tape having the following construction:

"(a) a backing of cellophane, which is a transparent, flexible, non-fibrous film backing having smooth, lustrous surfaces;

"(b) an adhesive coating prepared from rubber and resin which is normally tacky and pressure-sensitive, is water-insoluble, is firmly bonded to the backing, and is non-offsetting, and is transparent and flexible, the back surface of the backing being inactive to the adhesive coating to a degree permitting unwinding of the tape from the roll without delamination or offsetting of adhesive;

"(c) a primer coating interposed between the backing and adhesive coating and firmly bonding the adhesive coating to the backing, the primer coating being transparent and flexible."

"9. Tech. Tape further admits that prior to the time the counterclaim was filed it has manufactured, used and sold tape constructed as described in paragraph 5, except that the adhesive coating is prepared from polyvinyl ether rather than rubber and resin."

a New York corporation. The plaintiff, Technical Tape Corporation, a Delaware corporation, was organized in 1947, with a place of business in New York City. In August or September 1947 plaintiff hired Shalita, who had worked for Cofax from 1942 to early 1946 and then for another concern. Shalita became a director and Vice-President of plaintiff. Mr. Cohen, the President of Technical, testified that plaintiff leased a factory in October 1947 and began production in the late Spring of 1948. At first plaintiff produced paper backed and cloth tapes, like the masking tape of the Drew I patent, which had expired on May 27, 1947. Later it also manufactured cellophane backed tapes and tapes having backings with non-fibrous surfaces. According to the supplemental complaint, at least as early as 1950, plaintiff was preparing to manufacture film backed pressure-sensitive adhesive tape and had requested in writing a license from defendant which was refused in September and October 1950. It also appears that as early as October 1950 plaintiff had had a Canadian affiliate manufacturing the said tape upon instruction of plaintiff and that plaintiff had imported the tape from Canada. Also, according to the supplemental complaint plaintiff, itself, has manufactured cellophane backed pressure-sensitive adhesive tape of the kind defendant charged was being manufactured and sold by plaintiff in infringement of Drew II patent, No. 2,177,267, since as early as about May 1951 and had sold such tape in the United States since prior to November 17, 1951.

Plaintiff's infringement of defendant's patent was deliberate. When he was seeking a license from Minnesota the plaintiff's president declared he would make a pressure-sensitive adhesive tape whether or not he got the license. He read the Drew II patent a hundred times. He persuaded Beyer, an employee of Minnesota's, a quality control man who had access to and understood Minnesota's 'standard books' which were in code, to enter plaintiff's employ in May 1951 and to head plaintiff's quality control department; and he advised Beyer to keep from his employer (Minnesota) the fact that he was to enter plaintiff's employ. He hired an expert, Shalita, who had made an infringing tape for Cofax Corporation. That was the tape involved in Minnesota's suit against Freydberg, and its suit against Bulkley, heard by Judge Barnes who held that the Cofax tape infringed Minnesota's tape. The judgments were affirmed in 159 F.2d 554. Shalita had made tapes from the Drew patent examples. With that group around him, the president of the plaintiff-appellant herein, finally made a tape which was so similar to Minnesota's in every respect that at the trial even he could not tell the one from the other, without an identifying name on the core. The Technical Tape Corporation was a willful infringer. Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855.

### Defendant's Alleged "Misuse" of the Drew II Patent

As a special defense to defendant's counterclaim for patent infringement, plaintiff charges that the defendant has "misused"[6] the Drew II patent (No. 2,-177,627), and does not come into court with clean hands; and therefore asks that defendant be denied any relief on its counterclaim. Plaintiff contends that 3M abused its patent monopoly on transparent adhesive tape (Drew II patent) in two ways: (1) by selling its transparent adhesive tape on the condition that the purchaser thereof buy other 3M tape not covered by the patent in suit

---

6. The charge of "misuse" is contained in the last paragraph of plaintiff's "Reply" as follows:

"defendant sells its patented adhesive tape in commerce among the several states on the condition that the purchaser thereof shall buy adhesive tape, not covered by the patent in suit, from defendant, or its licensees; and that the purchaser shall refrain from buying adhesive tape not covered by the patent in suit from anyone other than defendant, or its licensees; whereby defendant unlawfully extends the monopoly, if any, of said patent to cover products not covered by any valid claim thereof."

(citing Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363); and (2) by selling its patented transparent adhesive tape on the condition that the purchaser thereof refrain from buying other adhesive tape products, not covered by the patent in suit, from any other manufacturer (citing F. C. Russell Company v. Consumers Insulation Company, 3 Cir., 226 F.2d 373).

To support the charge of "misuse" plaintiff took the depositions of six distributors, and at the trial produced oral testimony of a seventh distributor, and his wife.

The seven distributors are: Lloyd's Office Supply of Pawtucket, Rhode Island (an Industrial Tape Division account); Edwards Paper Company of Roxbury, Massachusetts (an Industrial Tape Division account); Southern Stamp and Stationery Company of Richmond, Virginia (an Industrial Tape Division account); Cammack Office Supply of Burlington, North Carolina (a Wholesale-Retail Tape Division account); Anchor Office Supply Company of Cleveland, Ohio (a Wholesale-Retail Tape Division account); Crown Office Supply Company of Chicago, Illinois (a Wholesale-Retail Tape Division account); and Aviation Service Supply Company of Denver, Colorado (an Automotive Tape Division account). Plaintiff also examined before trial Al Drew, defendant's New England District Sales Director of its Industrial Sales Division. Both sides read parts of Drew's deposition into the record of the trial. All the depositions were received as exhibits.

The defendant rebutted the charge of misuse, by the cross-examination of the distributors whose depositions were taken,[7] by the cross-examination of the Ar-

---

7. C. L. Arnold and his wife, Elizabeth, owners of the Lloyd's Office Supply Co. of Pawtucket, R. I., testified for the plaintiff, in part as follows:

The Lloyd Company's customers were mostly mills, factories, offices and governmental institutions. When Lloyd commenced business in 1949 it sold only the 3M line of tapes. In 1951 Lloyd took on Tech Tape products, which sold at a lower price. In September 1953 a 3M sales representative called on Mr. Arnold and told him that if he wished to continue selling 3M tape he would have to stop selling Tech Tape. Al Drew told Arnold that that was the defendant's policy. At the time there was an unfilled order for a customer named Glasscraft, a corporation in which Mr. Arnold had a stock interest. Later when Tech Tape came out with a new tape meeting Glasscraft's requirement Arnold sold Glasscraft some of that tape. Lloyd sells both "Technical" and "Industrial" tape products. About 81% of Lloyd's purchases of 3M tape from defendant, were on behalf of Glasscraft, to which defendant would ship direct.

Mr. Smith testified that he had no personal knowledge of the Lloyd company matter. Lloyd failed to meet defendant's requirements that the bulk of a distributor's buying should go to more than one customer, a policy that was in effect for a long time. Al Drew testified that the defendant did not have any policy under which defendant would refuse to sell any jobber unless he sold only 3M's tapes, and that he never offered Lloyd's any exclusive sales agreement. Bennison testified that the defendant had no exclusive dealing policy and no tie-in sales arrangement with any of its jobbers.

Mr. Trachtenberg of Edwards Paper Company of Roxbury, Mass., stated in his deposition taken by plaintiff in part as follows: That his company had been in business selling industrial customers since 1945, and that from 1947 to 1952 he had bought his tapes from the plaintiff (Technical Tape); that in 1952 he began to stock defendant's tapes. A salesman of defendant told him there was no reason why he could not handle defendant's tapes even though he was selling plaintiff's products. Early in 1953 defendant's agent cut him off, saying that it was pursuant to a new policy of exclusive handling, that if he handled any other tape he could not handle defendant's; and that an order he gave for 3M tape was refused by defendant in March 1953. On cross-examination it developed that in 1952 Edwards Paper Company made only five purchases of defendant's products, totaling $407.18 and two orders in January and February 1953 for $272.37; and that all of the purchases (except $40) were made for the benefit of a single customer (Ware Shoe Co.) whose requirements called for

nolds, by using parts of the deposition of Al Drew, by testimony of Charles C.

3M tape No. 880 and who had purchased 3M tape before becoming a customer of Edwards. The Edwards Company had also sold about $100.00 worth of 3M masking tape (the Drew I patent) in 1952 and 1953.

Al Drew testified that he instructed a salesman, Mr. Burhoe, to notify the Edwards Company that it was no longer considered a distributor. One of the requirements for defendant's distributors was that the bulk of their sales should be to more than one customer. The Edwards Company's sales were practically all to one customer.

Mr. Smith had no personal knowledge of the Edwards Company matter, but he had heard about it. It was not in his subdivision. Mr. Bennison, who was Mr. Drew's superior, testified that the defendant had no exclusive dealing agreement or any tie-in sales arrangement with any of defendant's jobbers.

The deposition of Mr. Rosendorf, a partner in Southern Stamp and Stationery Co. of Richmond, Virginia, taken by plaintiff, was in part as follows: The Company sells a line of stationery supplies, office furniture and equipment and is one of the largest in Richmond. It purchased 3M products from 1942 to 1952, averaging about $40,000 a year. In 1953 it sold $25,000 of 3M products, mostly drop shipments and its principal customer was Reynolds Metals Co. In late 1952 Southern opened an account with Tech Tape as a distributor. In November 1953 two representatives of 3M called on Southern and complained that other makes of tape were being used in 3M dispensers. Southern was selling Tech tapes to the Reynolds Co., which was using it in 3M dispensers, acquired when Reynolds used 3M tape. The representatives of 3M said they would not recommend that Southern be not allowed to sell 3M tape. In December 1953 Rosendorf was again visited by representatives who said Southern's orders for 3M tape would not be filled, that Southern could have them filled by "the other fellow," Tech Tape. Southern's orders for 1953 were mostly drop shipments to manufacturing customers. For the last nine months of 1953 Southern's total purchases of 3M tapes for store customers was only $194.96. In five of those nine months Southern made no such purchases. Southern was pushing Tech tape in preference to 3M's, even when the customer asked for 3M's tape, because Tech tape was cheaper and afforded Southern a

Smith, General Manager of the defendant's Cellophane Tape Division for the

larger profit. Only if the customer insisted on 3M tape did Southern sell him 3M. It was Southern's policy to do that. Mr. Smith testified that he did not know the details of the Southern Company matter.

Plaintiff took the deposition of Mr. Cammack, the owner of Cammack Office Supply of Burlington, North Carolina, who testified in part as follows: He had handled 3M products and those of Industrial Tape Corp. (a licensee of 3M) beginning 1946 or 1947; and some time later took on the Tech Tape line. In October 1953 he was visited by a salesman and a representative of 3M, who saw Tech Tape products on his shelves. They told him of the pending patent infringement suit. He said that he was going to continue selling Tech tape. He was again visited by 3M's salesman in January or February 1954, looking for an order. Although he was short on 3M products he limited his order to 3M dispensers and small sizes of Scotch tape. Next day he was told his order would not be filled. Between October 1953 and February 1954 he had made no effort to replenish his stock of 3M tape. He was selling Tech tape instead, and was displaying Tech cellophane tape in defendant's Scotch tape dispensers, which bore defendant's name. Mr. Smith of 3M testified that Cammack was not cut off and that he was still carried on the records of 3M's Atlanta Branch as an active customer.

Plaintiff took the deposition of Anchor Office Supply Co. of Cleveland, Ohio, through its president, Mr. Rosenblatt, who testified in part, as follows: The company was organized in June 1950 and handled office supplies and equipment and sold various types of tapes, including masking tape and cellophane tape. At first it handled 3M tape. It sold about $12,000 a year of 3M's cellophane tape and masking tape. In 1952 Anchor began handling Tech tape. In April 1954 when the City of Cleveland asked for bids on "Scotch" tape, Rosenblatt inquired if the City would accept a tape equally as good and he was the successful bidder and supplied Tech tape. Shortly thereafter two of 3M's salesmen came to see him about the bid and he was told that if he continued to sell Tech tape, 3M would be forced to take its line away from him. Rosenblatt stated that he then called the Department of Justice office in Cleveland to inquire if they could do that to him, and shortly thereafter (April 7th) received a letter

Wholesale-Retail trade, and by testimony of John J. Bennison, the Eastern Regional Sales Manager for the Industrial Trade Division of defendant.

from the Department saying that an investigator of the Department, an Agent of the F.B.I., would call upon him. Rosenblatt contended that the letter was in response to the telephone call. But the letter was from New York, not from Cleveland, and at that time an investigation of all the stationers in Cleveland was in progress, in connection with an indictment handed down against a local group of stationers early in 1954. Mr. Rosenblatt had been informed prior to his conversation with the two 3M representatives that there was a patent suit pending between 3M and Tech Tape. Since the conversation Anchor has purchased mainly one line of tape, 3M, but it has also purchased Tech tape to fill certain contracts on which Anchor submitted bids. There was some testimony that Anchor had sent a drop shipment order for 1152 rolls of 3M's tape for a small restaurant next door to Anchor's place of business (the inference being that the order was actually for Anchor itself), on which Anchor got an additional 7½% discount. Mr. Smith testified that the discussion with Rosenblatt and the differences between them had to do with the matter of Anchor's substituting Tech tape on orders for 3M tape, and also using fake drop shipments, all of which Anchor agreed to stop; and that 3M has never refused to sell Anchor.

Three representatives of the Crown Office Supply Company, of Chicago, Illinois, Mr. Avery, President, Mr. Ackerman, Vice-President, and Mr. Schultz, a purchasing officer, testified by deposition, in part as follows: The company first sold 3M's Scotch tape in the early 1930s. In 1939 or 1940 they sold defendant's "masking" tape. They ceased making purchases from defendant in December 1952. After the Tech line of products was taken on by Crown, 3M's products were no longer advertised in Crown's circulars but Tech Tape's were. Crown's twelve salesmen at the same time were instructed to tell their customers that Tech's line was a good line, comparable to what Crown had been selling (3M's), but sold at a lower price. When a customer asked for "Scotch" tape, defendant's product, Crown's salesmen would try to sell him the Tech tape product. Money-wise it was to Crown's advantage to push Tech tape. Crown had theretofore purchased an average of $30,000 to $40,000 of 3M tapes a year.

In December 1952 two representatives of defendant called upon Crown with a Crown trade circular. Crown's business with 3M had fallen off in the last few months. Crown's circular was pushing Technical Tape's products and did not mention 3M's. Crown allegedly was told that if it continued selling Tech tape the defendant would not sell Crown any more. Orders sent 3M were refused.

Mr. Smith, for defendant, testified that Crown was substituting Tech tape on customers' orders for Scotch tape, and that Crown was told that unless it stopped that practice, defendant did not want to do business with it. Crown also, according to Mr. Smith, had submitted false drop-delivery orders to 3M, in order to gain an additional discount. Crown had put out the trade booklet above mentioned. Mr. Smith sent a representative to protest against these unfair and discriminatory practices.

Plaintiff also took the deposition of Mr. Christensen, Treasurer and Chairman of Aviation Service Supply Company of Denver, Colorado. At one time the company carried the tape products of Industrial Tape Corp., 3M and Tech Tape Corp. It is no longer an authorized distributor of 3M products. Aviation tried to become a distributor for 3M, but defendant was unable to meet the requirements of its current jobbers. Aviation then became a distributor for Industrial Tape and sold as much as $7,000 a month of its products. Late in September 1953, Aviation agreed, at the request of several customers, to become a distributor of 3M products. An arrangement was made, expressed in correspondence.

In the Spring of 1954 a representative of 3M called on Christensen concerning a bid in which Aviation had quoted and specified Tech tape. Christensen testified that further visits were made and that he was informed that because of Aviation's activities with competing lines, 3M felt it could not properly represent and promote 3M's products and that it was no longer an authorized distributor and could return 3M merchandise for credit. There was some correspondence between the two companies.

On Christensen's cross-examination it was developed that at times Aviation's salesmen would attempt to sell Tech tape to customers who had specified 3M tape; that Aviation permitted its office facilities to be utilized by Tech Tape sales representatives as a base of operations, and that Aviation had been tardy in paying its bills to 3M. When Aviation and

Concerning the seven distributors, the trial judge stated in his opinion: "The situation with respect to each of these seven distributors has been considered and the Court is satisfied that the conduct of 3M (the defendant) in each instance was motivated solely by honest business considerations in no wise related to an attempt to extend the monopoly of the Drew Patent."

A jobber who resorted to the disparagement of defendant's products in order to substitute other and cheaper brands of tape, including infringing brands of tape, where the customer wanted defendant's tapes; a jobber who did not deal fairly with defendant's products in displaying and selling them; a jobber who was more interested in pushing the sales of competitors' products to the detriment of defendant's products; a jobber with only a few customers, who made no effort to sell defendant's products; a jobber who faked so called "drop shipment" orders to mislead the defendant and thus gain a larger discount; a jobber who was habitually delinquent in paying his bills—jobbers who did any of those things were not desirable distributors of defendant's products and defendant was not required to continue them as distributors.

A "drop shipment" order called for direct shipment of 3M's products to the jobber's customer. The jobber would receive a trade discount on such orders, because as a rule they were large and saved 3M warehousing expense. Some jobbers submitted fictitious orders and thereafter picked up the goods themselves to be utilized as stock inventory, thereby receiving a trade discount which was not given on purchases by jobbers for their own stock inventory.

The so-called "select distributorship policy" concerning which Al Drew was

examined, was developed by the Industrial Tape Division about mid-summer of 1953. It did not apply to any other tape division of the 3M organization. Two of the five distributors (Aviation and Crown), alleged to have been cut off because of their refusal to agree to the select distributorship policy, were not industrial jobbers within the jurisdiction of 3M's Industrial Tape Division.

As to the three remaining, Southern was cut off from 3M's tape products in December of 1953 for reasons stated herein in footnote 7. There is nothing in the testimony to support plaintiff's contention that Southern was cut off because it refused to accept the so-called "select distributorship policy." Likewise there was no connection between Edwards being cut off as a 3M distributor and the select distributorship policy of the 3M Industrial Tape Division. Edwards was cut off for other reasons, as indicated in footnote 7, some four or five months prior to the time the "select distributorship policy" was proposed by 3M's Industrial Tape Division.

The testimony of Arnold and his wife (Lloyd's Office Supply Co.) that in September of 1953 he was informed that 3M had a new company policy and that under such policy Lloyd, if it wished to continue selling 3M tape would have to agree to shop selling Technical Tape, and that when he refused he was cut off, was inconsistent with the testimony of Al Drew, who denied that any proposal of select distributorship was made to Lloyd's Office Supply Company, and was inconsistent with the testimony of Bennison and Smith, witnesses at the trial, who testified that 3M does not have a sales policy requiring a jobber or distributor to sell only 3M tape and to refrain from selling other competitive brands. Apparently the trial judge ac-

---

3M came to a parting of the ways in March 1954, Mr. Christensen wrote 3M: "We wish to thank you for past favors you have rendered our company and wish to express our regrets for the circumstances which had made this necessary." On the same day Mr. Christen-

sen wrote Tech Tape a letter condemning defendant and enclosing copies of Aviation's correspondence with defendant, for plaintiff's use. Mr. Smith knew none of the details of the Aviation Company matter.

cepted the testimony of Messrs. Bennison and Smith, which he had a right to do. He saw and heard the witnesses in question.

As stated in International Bureau v. Bethlehem Steel Co., 2 Cir., 192 F.2d 304, 306:

"It is a familiar principle that on appeal in cases tried by the court without a jury findings of fact will be given effect unless shown to be clearly erroneous. [Citing cases.] And, indeed, that principle, together with the correlative one that due regard be given to the opportunity of a trial judge in a non-jury case to determine the credibility of witnesses who appear and testify before him, is firmly embodied in Rule 52(a) F.R.C.P., 28 U.S.C.A."

The trial judge did not specifically discuss Al Drew's testimony [8] in his opinion, but he did state (as a finding of fact based on the evidence) that defendant distributes its products through upwards of 30,000 outlets, including 6,000 paper wholesalers and 4,000 commercial stationers; that many thousands of defendant's distributors and jobbers handle competitive tapes and that "3M" (Minnesota) has never required either that they handle its tapes exclusively; or that as a condition of buying one type of 3M tape, that they should also buy another.[9]

8. The witness, Albert Drew (a brother of the inventor) whose deposition was taken by plaintiff, stated in the first part of his deposition, that he had submitted to a number of jobbers in New England the proposal that they handle only 3M's pressure-sensitive adhesive tape.

He was asked by plaintiff's counsel whether he had made any "gentlemen's understandings or agreements" with any jobbers or distributors to handle 3M tape exclusively. Drew answered: "In this respect: That we have proposed certain things and they have or have not accepted them." When asked what things he had proposed, Drew answered: "We have proposed to certain distributors that we think are qualified that we furnish them with all the product knowledge we have as salesmen; the facilities of our laboratory; the facilities of our customer engineering group, our merchandising group, and our sales force, and to teach them as much as we can of what we know about the application of pressure-sensitive tapes; where the customers may be found or where they are likely to be found, according to application; to make them as good salesmen for our tapes as we think we ourselves are."

Al Drew testified that these suggestions or proposals were made to jobbers or distributors in the industrial tape division; and that he first made such proposals in the middle of the summer of 1953. Prior to that time 3M provided technical service and assistance to its industrial jobbers and distributors, but in a limited way. Under the new proposal the amount of technical assistance available would be increased. Drew testified that his action in offering such proposals to certain qualified jobbers was reported to his superiors and that they did not disapprove of it.

Of the 25 or 30 who accepted the proposal, all but five or six of the jobbers had always done business with 3M and sold only 3M tape. Five or six, who agreed to give the proposal a trial, had carried pressure-sensitive tapes made by 3M competitors.

Al Drew testified that 3M's general policy with regard to industrial distributors and jobbers, handling or about to handle pressure-sensitive adhesive tape, was that the jobber or distributor have an office and a warehouse; that he have a sales force of at least one, other than the owner; that he have a good credit record; that he have contact with manufacturers who would be 3M customers; that he agree to maintain an adequate stock of 3M tape items so as to properly take care of the immediate needs of its customers; that he have more than one customer using 3M products; and that the bulk of his buying or purchases should be resold to more than one customer. Mr. Drew further testified that this policy was in effect in 1950 and applies with equal force today. Drew defined an industrial distributor or jobber as one whose customers are manufacturing plants, mills and factories. He also testified that defendant did not have any policy of refusing to sell a distributor or jobber because he handled competitive tapes.

9. Mr. Smith, general manager of the Cellophane Tape Division of 3M, and Mr. Bennison, Eastern Regional Sales Manager of the Industrial Tape Division, testified before the trial judge as witnesses for the defendant 3M.

The trial record on the issue of the so-called "select distributorship policy" proposal, shows that the proposal was made only to certain jobbers or distributors, who were thought to be qualified and not to all the jobbers served by 3M's Industrial Tape Division; that the proposal was not made on any either-or basis, i. e. that if rejected the distributor would be cut off from 3M products; that the acceptance was purely voluntary on the part of the jobber; that the proposal was rejected by some distributors; that those who rejected the proposal were not cut off from 3M products; and that those who accepted the proposals received increased technical service and assistance while those who rejected the proposals, together with other jobbers or distributors who did not qualify, continued to receive 3M products and the technical service and assistance theretofore given them. This fact situation in the case at bar is in no way comparable to that before the Third Circuit in F. C. Russell Company v. Consumers Insulating Company, supra.

The trial judge also found that a large percentage of distributors identified by the President of Technical Tape as 3M distributors in the New York area are, according to his testimony, also distributors of Technical Tape's products; and that many Technical Tape jobbers or distributors also handle 3M products.

■ The trial court's opinion refers to the practices condemned by the doc-

Mr. Bennison's testimony was short and he was not cross-examined. He testified that he was employed by 3M for over eighteen years and supervised the industrial tape sales for the Eastern Seaboard. His salesmen would call on manufacturing concerns and distributors who serviced that class of trade. He stated that sales to industrial distributors were not made on any condition that the distributor deal only in 3M tape; that the distributors who purchased 3M tape also purchased tape from others; that 3M made no tie-in sale arrangement with its distributors; that no jobber was required to handle any one type of tape in order to purchase another; and that the customers of the jobbers pretty well determined what the jobber would buy.

Mr. Smith described the managerial set up of 3M. He testified that 3M has three tape divisions, each one headed by a general manager; that he had been general manager of the 3M Cellophane Tape Division for a number of years; that one of the other two divisions dealt with insulation tape; and the third with all other types of tape; that each division had regional sales managers who in turn had district sales managers. Mr. Smith also testified that the Cellophane Tape Division had two subdivisions, the Industrial subdivision and the Wholesale and Retail subdivision; that each of the subdivisions had its own general manager; that the Wholesale-Retail subdivisions serviced the retail trade through jobbers, and sold principally cellophane tape; that the Industrial division sold to manufacturers through jobbers or distributors, whose sales are mainly of tapes other than cellophane, although they may also sell cellophane tape to industrial users; and that Al Drew was a district sales manager for the Industrial Tape Division.

Mr. Smith also testified that 3M did not require its distributors or jobbers to handle 3M tape exclusively; that many thousands of them carried competing brands; that no jobber is required to buy any other type of 3M tape in order to buy a particular type; that some jobbers handled only one type of 3M tape; that the jobber himself decides what he wants to buy, based on his customers' needs. Mr. Smith also testified that 3M never had any policy of exclusive distributorship for a given territory; that any jobber or distributor may purchase 3M tape, if he can qualify as such.

Smith further testified that while district sales managers possessed a discretion as to how they would handle their own accounts, they were supposed to conform to established policies; that prior to December 1953 it was the policy to leave the matter of distribution and distributors to the field managers, i. e., the regional managers of 3M; that he had heard that the Industrial Tape Division was operating under what they called a select distributorship policy, but that it did not apply to his Wholesale-Retail Division, although some distributors were in both divisions. The select distributorship policy involved a closer cooperation with the distributor in terms of direct selling, engineering services, technical assistance and the like; the select distributors did not carry 3M tapes exclusively.

**358**

trine of the Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363 (which declared that a court of equity will not lend its aid to protect a patent monopoly when the patentee is using the patent as an effective means of restraining competition with the sale of its unpatented articles) the trial court stated: "There has been a complete failure of proof that the sales policy of 3M falls within the interdicted conduct." And there is no proof that defendant violated Section 3 of the Clayton Act (15 U.S.C.A. § 14).[10] In fact the proof is to the contrary. The defense of "misuse" by defendant of its Drew II patent, appears to be something that plaintiff sought in vain to construct, in order to escape the consequences of its own deliberate and profitable infringement.

A manufacturer has the right to stop dealing with a distributor or jobber who is acting unfairly towards his product or is trying to undermine his trade. That seems to be a proper corollary of Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, at page 614, 34 S.Ct. 951, at page 955, 58 L.Ed. 1490, where it was held that:

"A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade."

Ordinarily a manufacturer may refuse to deal with a distributor or jobber for reasons sufficient to himself. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992; United States v. Schrader's Son, Inc., 252 U.S. 85, 97, 40 S.Ct. 251, 64 L.Ed. 471; and Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99, 101–102. Of course, this right of a manufacturer must be exercised in good faith, and within the restrictions of the Clayton Act, and may not be exercised in such a manner so as to "substantially lessen competition" or "tend to create a monopoly" in any line of commerce.

The record in the case does not establish that 3M's refusal to sell to five of the abovenamed distributors was done in bad faith, and had as its purpose to substantially lessen competition, or had a tendency to create a monopoly. Further, the Clayton Act was not intended to reach every remote lessening of competition. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356–357, 42 S.Ct. 360, 66 L.Ed. 653.

There has been no showing here that "competition has been foreclosed in a substantial share of the line of commerce affected," by the so-called select distributorship policy. Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371; Dictograph Products v. Federal Trade Commission, 2 Cir., 217 F.2d 821, 825. This is not a case where the manufacturer imposed a uniform exclusive dealing contract on its jobbers and distributors, such as was the situation in the Dictograph and Russell cases,

10. "§ 14. Sale, etc., on agreement not to use goods of competitor.
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia of any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. Oct. 15, 1914, c. 323, § 3, 38 Stat. 731."

hereinbefore cited, on which plaintiff relies.

The judgment of the District Court is in all respects affirmed.